[Cite as *Woodside Mgt. Co. v. Bruex*, 2020-Ohio-4039.]

| | |
|---|---|
| STATE OF OHIO      )<br>           )ss:<br>COUNTY OF SUMMIT    ) | IN THE COURT OF APPEALS<br>NINTH JUDICIAL DISTRICT |
| WOODSIDE MANAGEMENT<br>COMPANY, d/b/a/ OHIO WOODSIDE<br>MANAGEMENT COMPANY, et al. | C.A. No.     29179 |
|     Appellees/CrossAppellants | APPEAL FROM JUDGMENT<br>ENTERED IN THE<br>COURT OF COMMON PLEAS<br>COUNTY OF SUMMIT, OHIO<br>CASE No.    CV 2014-07-3358 |
|     v. | |
| ANDREW BRUEX, et al. | |
|     Appellants, Cross-Appellees | |

DECISION AND JOURNAL ENTRY

Dated: August 12, 2020

CALLAHAN, Presiding Judge.

**{¶1}** Appellants/Cross-Appellees, Andrew Bruex, Bruex Properties, L.L.C., and Andrew J. Bruex, Trustee of the Andrew J. Bruex Revocable Trust (collectively "the Bruex Parties") and Appellees/Cross-Appellants, Woodside Management Company, dba Ohio Woodside Management Company and Woodside Logic Corporation (collectively "the Woodside Parties"), appeal from the judgment of the Summit County Court of Common Pleas. For the reasons set forth below, this Court affirms in part, reverses in part, and remands the matter for further proceedings consistent with this decision.

I.

**{¶2}** Mr. Bruex was the founder and, eventually, the sole shareholder of Industrial Logic Controls, Inc., a Michigan distributor of automation systems and components that operated out of a building located at 7136 East Kilgore Road in Kalamazoo, Michigan ("the Kilgore Road

property"). The property consisted of 11 acres and was managed by Bruex Properties, L.L.C. ("Bruex Properties") on behalf of the owner, Andrew J. Bruex, Trustee of the Andrew J. Bruex Revocable Trust ("the Bruex Trust").

{¶3} On October 25, 2011, Mr. Bruex entered into a Stock Purchase Agreement with B.W. Rogers Company for the sale of the shares of Industrial Logic Controls, Inc. As consideration for the acquisition of Industrial Logic Controls, Inc., B.W. Rogers Company paid Mr. Bruex a down-payment and executed two Promissory Notes payable to Mr. Bruex for the balance of the purchase price. The Stock Purchase Agreement contained a provision providing B.W. Rogers Company the right to withhold and offset against the amount due under the Promissory Notes for any damages to which B.W. Rogers Company may be entitled under the Stock Purchase Agreement.

{¶4} Under the terms of the Stock Purchase Agreement, Mr. Bruex delivered the Amended and Restated Lease ("Lease") which was entered into between Industrial Logic Controls, Inc. (now owned by B.W. Rogers Company) and Bruex Properties. This Lease provided for Industrial Logic Controls, Inc., after its acquisition by B.W. Rogers Company, to continue operating at the Kilgore Road property. The Lease was a triple net lease for a period of seven years and comprised 1.5 acres, in addition to the parking lot and the building.

{¶5} Before proceeding with the Stock Purchase Agreement, Mr. Bruex and B.W. Rogers Company shared the cost of a Phase I environmental site assessment performed by Villa Environmental Consultants, Inc. ("Villa") on the Kilgore Road property. The Villa Phase I assessment "revealed no evidence of recognized environmental conditions in connection to" the Kilgore Road property. B.W. Rogers Company elected not to conduct a Phase II assessment which would have tested the water and soil for the presence of hazardous substances. Under the Stock

Purchase Agreement, Mr. Bruex warranted that as of October 31, 2011 there were no hazardous substances on or in the environment of any property owned, operated, or managed by Industrial Logic Controls, Inc.

{¶6} During 2013, B.W. Rogers Company engaged in negotiations with Kaman Fluid Power, LLC ("Kaman") regarding the sale of substantially all of B.W. Rogers Company's assets and Industrial Logic Controls, Inc.'s assets. In April 2014, B.W. Rogers Company sold those assets to Kaman, but retained its stock and interest in Industrial Logic Controls, Inc.

{¶7} Prior to executing the asset purchase agreement in February 2014, Kaman had Environmental Resources Management ("ERM") conduct a Phase I assessment and a Phase II assessment on the Kilgore Road property. The Phase II assessment found a variety of hazardous substances in the soil and water. B.W. Rogers Company notified Mr. Bruex in February 2014 of these findings and had its own supplemental Phase II assessment performed by Fishbeck, Thompson, Carr & Huber ("FTC&H"). Mr. Bruex also obtained a new assessment from Villa and began to remediate the contaminants in the water.

{¶8} Based upon the results of the Phase II assessment, Kaman added a closing condition to the asset purchase agreement with B.W. Rogers Company: Industrial Logic Controls, Inc. was required to vacate the Kilgore Road property and enter a new lease at a location, approved by Kaman, in Kalamazoo, Michigan before the closing of the deal in April 2014. Similarly, Mr. Rogers (the president of B.W. Rogers Company) was concerned about the safety of his Industrial Logic Controls, Inc. employees at the Kilgore Road property and instructed his financial officer to find a new lease location.

{¶9} In March 2014, Industrial Logic Controls, Inc. vacated and surrendered the Kilgore Road property on the basis of the discovered hazardous substances in the water and land at the

property and Mr. Bruex's failure to remediate. Based upon the foregoing, B.W. Rogers Company gave Mr. Bruex notice of his breach of the Stock Purchase Agreement and its total damages incurred by his breach. B.W. Rogers Company then exercised its right to offset the amount due under the Promissory Notes and paid off the Promissory Notes.

{¶10} After the closing of the asset sale, B.W. Rogers Company changed its name to Woodside Management Company, dba Ohio Woodside Management Company ("Woodside Management"). Similarly, Industrial Logic Controls, Inc. changed its name to Woodside Logic Corp. ("Woodside Logic").

{¶11} In the amended complaint, Woodside Management (fka B.W. Rogers Company) and Woodside Logic (fka Industrial Logic Controls, Inc.) sued Mr. Bruex, Bruex Properties, and the Bruex Trust. The Woodside Parties sought three declaratory judgments: 1) the Bruex Parties breached the Stock Purchase Agreement and the warranties therein; 2) the Bruex Parties breached their covenants, warranties, and duties to the Woodside Parties and the Woodside Parties were constructively evicted; and 3) the Lease is invalid and unenforceable. Additionally, the Woodside Parties alleged two claims seeking damages, one for the breach of the Stock Purchase Agreement and the other for breach of the Lease. The Bruex Parties answered the amended complaint and filed a counterclaim against the Woodside Parties alleging breach of the Lease and breach of the Promissory Notes.

{¶12} The parties filed cross motions for summary judgment which were denied. On the parties' motions for reconsideration, the trial court again denied summary judgment, but determined that Michigan law governed the Lease and Ohio law governed the Stock Purchase Agreement. Based upon that ruling, the Woodside Parties moved for leave to name additional experts regarding the mitigation of damages under the Lease. That motion was denied.

{¶13}   The trial judge ruled that the Lease was valid[1] and enforceable under Michigan law and the remaining matters were tried to a jury.   The jury returned verdicts in favor of Bruex Properties against Woodside Logic on the breach of the Lease and the quiet enjoyment and constructive eviction claims and awarded Bruex Properties $186,745.   As to the breach of the Stock Purchase Agreement and the Promissory Notes, the jury found in favor of Woodside Management and against Mr. Bruex.

{¶14}   After the verdicts were read, but before the jury was released, the Bruex Parties objected, arguing that there was an inconsistency between the interrogatory answer finding Woodside Management was allowed to set off $48,940 from the Promissory Notes for Mr. Bruex's breach of the Stock Purchase Agreement and the verdict finding Woodside Management did not breach the Promissory Note and awarding no damages to Mr. Bruex.   The trial court agreed that there was an inconsistency and returned the jury for further deliberations.   When asked for clarification, the jury responded that Mr. Bruex was "entitled to any money not set off from the Promissory Notes[.]"   The trial court interpreted the jury's clarification interrogatory answer to mean that Mr. Bruex should be awarded $74,000 on the breach of the Promissory Notes claim and entered judgment accordingly.   After additional briefing and hearings, the trial court awarded attorney fees and prejudgment interest to the respective parties.

---

[1] Prior to opening statements and in response to the Woodside Parties' request for clarification of an earlier motion in limine ruling regarding the exclusion of evidence as to the ownership of the leased property and the capacity of the lessor to sign the lease, the trial judge stated: "I already ruled that I found that the contract was valid and enforceable and it was meant to be valid and enforceable regardless of under which capacity Mr. Bruex signed the agreement or the lease. So, that's going to be my ruling." The trial judge repeated this "ruling" in response to the Woodside Parties' proffer of evidence on this issue: "And I will just remind Plaintiffs that I did find that there was a valid contract." Despite the trial judge's repeated statements that she "already ruled," this ruling was not journalized until after the conclusion of trial in the July 20, 2017 Judgment Entry setting forth the jury's verdicts on the other claims.

{¶15} The Bruex Parties filed a timely appeal, raising five assignments of error for our review. The Woodside Parties filed a timely cross-appeal, raising nine assignments of error. The assignments of error contained in the Bruex Parties' appeal and the Woodside Parties' cross-appeal are rearranged and organized as to the respective agreements for purposes of discussion.

II.

**THE LEASE AGREEMENT**

**THE WOODSIDE PARTIES' ASSIGNMENT OF ERROR NO. 1**

THE TRIAL COURT ERRED IN RULING THAT THE LEASE IS GOVERNED
BY MICHIGAN LAW AND NOT OHIO LAW.

{¶16} The Woodside Parties contend that the trial court erred in determining that the Lease is governed by Michigan law and not Ohio law. We agree.

{¶17} Summary judgment is proper under Civ.R. 56(C) when: (1) no genuine issue as to any material fact exists; (2) the party moving for summary judgment is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can only reach one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(C); *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). An appellate court reviews a decision granting or denying summary judgment de novo. *State ex rel. Sunset Estate Properties, L.L.C. v. Lodi*, 142 Ohio St.3d 351, 2015-Ohio-790, ¶ 6.

{¶18} Additionally, appellate courts apply a de novo standard of review to a trial court's choice-of-law determination. *Nationwide Mut. Fire Ins. Co. v. Rose*, 9th Dist. Lorain No. 05CA008814, 2007-Ohio-1216, ¶ 7. Similarly, the interpretation of a written contract is a question of law subject to de novo review on appeal. *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, ¶ 38. When reviewing a matter de novo, this Court does not give deference to the trial court's decision. *Eagle v. Fred Martin Motor Co.*, 157 Ohio App.3d 150,

2004-Ohio-829, ¶ 11 (9th Dist.). In the instant case, this Court reviews de novo the trial court's summary judgment decision interpreting the Lease and the Stock Purchase Agreement and determining the applicable state law regarding the Lease.

{¶19} Stock purchase agreements and leases are contracts, which are subject to interpretation using traditional contract principles. *See ASA Architects, Inc. v. Schlegel*, 75 Ohio St.3d 666, 673 (1996) (stock purchase agreement); *Rongone v. Ohio Machine Tool & Design, Inc.*, 9th Dist. Summit No. 14706, 1991 WL 35101, *2 (Mar. 13, 1991) (stock purchase agreement); *Christe v. GMS Mgt. Co., Inc.*, 124 Ohio App.3d 84, 88 (9th Dist.1997) (lease). The object of contract interpretation is to ascertain and effectuate the intent of the parties. *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, ¶ 9; *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313 (1996). *See Myers v. The East Ohio Gas Co.*, 51 Ohio St.2d 121, 125 (1977) ("[C]ourts * * * should give effect to the unambiguously expressed intent of the parties."). The parties' intent is presumed to be reflected in the language they selected to use in their agreement. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus. Thus, the court must read the contract as a whole and give effect to every part of the contract, if possible. *Saunders* at ¶ 16. Additionally, "[w]here one instrument incorporates another by reference, both must be read together[,]" and where possible, the court must give effect to all of the terms. *Christe* at 88.

{¶20} A reviewing court should give the common words used in a written instrument "their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph two of the syllabus. "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, ¶ 37. The court

may not construe a contract in such a way that is inconsistent with the unambiguous contract terms. *Butler v. Joshi*, 9th Dist. Wayne No. 00CA0058, 2001 WL 489962, *2 (May 9, 2001), citing *Alexander* at 246. "Contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244 (1974), paragraph one of the syllabus.

{¶21} The Woodside Parties argue that the language in the Stock Purchase Agreement and the Lease are unambiguous and must be enforced as written. Accordingly, the Woodside Parties contend that the plain, ordinary, and common meaning of the language in the Stock Purchase Agreement and the Lease reflects the parties' intent that the Lease is subject to the choice-of-law provision which provides that Ohio law governs and the principles of conflict of laws do not apply.

{¶22} The Bruex Parties do not directly oppose or address the Woodside Parties' position that the Stock Purchase Agreement and the Lease are unambiguous. Absent from their brief is any citation or reference to the principles of contract interpretation and any explicit statement that the language in these agreements is ambiguous. Nor do the Bruex Parties argue that the language in the Stock Purchase Agreement and the Lease is susceptible to multiple reasonable interpretations. Rather, they assert an alternative interpretation of the parties' intent in those agreements: the Lease is governed by Michigan law pursuant to the conflict of laws rule. In this case, the parties' suggestion of two different interpretations of the contract language does not render a contract term ambiguous. *The Glidden Co. v. Kinsella*, 6th Cir. No. 09-3599, 2010 WL 2803944, *6 (July 15, 2010). Since there is no dispute that the terms of the Stock Purchase Agreement and the Lease are unambiguous and clear, we apply the plain, common, and ordinary meaning of the terms in these

two agreements to determine the parties' intent regarding which state law governs the Lease. *See Sunoco, Inc. (R & M)* at ¶ 37.

{¶23} Section 10.9 of the Stock Purchase Agreement states in part, "[t]he schedules and exhibits referred to herein are attached hereto and incorporated herein by this reference * * *." The Stock Purchase Agreement identifies the Lease as Exhibit 2.2(a)(iv), recognizes that the Lease is attached thereto, and refers to the Lease as one of the documents Mr. Bruex was required to deliver to B.W. Rogers Company at the closing of the stock sale. Accordingly, the Lease is attached and incorporated by reference into the Stock Purchase Agreement and these two instruments must be read together as one agreement, and where possible, effect given to each contract term. *See Padula v. Wagner*, 9th Dist. Summit No. 27509, 2015-Ohio-2374, ¶ 23-24.

{¶24} The incorporation provision in Section 10.9 of the Stock Purchase Agreement further states that "and unless the context expressly requires otherwise, such schedules and exhibits are incorporated in the definition of 'Agreement.'" The first sentence of the Stock Purchase Agreement identifies "Agreement" as the term used to refer to the Stock Purchase Agreement. This additional incorporation language in Section 10.9 of the Stock Purchase Agreement expands the definition of Agreement to also include the schedules and exhibits attached to the Stock Purchase Agreement.

{¶25} This provision, however, specifically allows for the schedules and exhibits to be excluded from the meaning of Agreement when the "context expressly requires otherwise[.]" A review of the Lease and the Stock Purchase Agreement does not present or suggest any context expressly requiring that the Lease not be incorporated into the definition of "Agreement." Accordingly, the term "Agreement" in the Stock Purchase Agreement also refers to the Lease.

**{¶26}** Additionally, the Stock Purchase Agreement contains an integration clause in Section 10.6 that states in pertinent part,

> This Agreement, the schedules and exhibits attached hereto, any documents delivered pursuant hereto, together constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties, and there are no warranties, representations or other agreements among the parties in connection with the subject matter hereof except as set forth specifically herein or contemplated hereby. * * *

Based upon Section 10.6, the Stock Purchase Agreement is fully integrated and includes the attached exhibits and schedules. *Compare Christe*, 124 Ohio App.3d at 89. The Lease must be considered as a part of the Stock Purchase Agreement because it is one of the identified exhibits attached to and incorporated into the Stock Purchase Agreement. *See id.* When a contract is integrated, the court gives effect to those intentions expressed by the parties. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989).

**{¶27}** Section 10.4 of the Stock Purchase Agreement, titled "Governing Law and Venue," states "[t]his Agreement shall be governed by and construed in accordance with the substantive laws of the State of Ohio without reference to principles of conflicts of law." Because the Lease is incorporated by reference into the Stock Purchase Agreement, incorporated into the definition of Agreement, and considered to be a part of the Stock Purchase Agreement pursuant to the integration clause, the choice-of-law provision in the Stock Purchase Agreement also applies to the Lease.

**{¶28}** The choice-of-law provision not only designates Ohio as the governing law, it also excludes the "principles of conflicts of law." This additional clause reflects the parties' intent that their choice for Ohio substantive law to govern the Stock Purchase Agreement and the Lease is absolute and not subject to alteration by the principles of the conflict of laws.

{¶29} The Bruex Parties assert that there is a different interpretation of the parties' intent arising from these agreements. They present the following arguments in support of their position that the parties intended for Michigan law to govern the Lease.

{¶30} First, the Bruex Parties suggest that despite the incorporation provision in the Stock Purchase Agreement, the parties did not intend for the Lease to be incorporated into the Stock Purchase Agreement, because "[t]here are two separate agreements between different parties at issue in this case[.]" In support of this statement, the Bruex Parties identify the respective parties to the agreements, but fail to explain how those parties are, in fact, different. Absent from the Bruex Parties' appellee brief, as well as the trial court's order applying Michigan law to the Lease, is any explanation or legal authority regarding the legal significance that the parties in each agreement were different under the facts of this case. Instead of developing and supporting an argument as to this point, the Bruex Parties only make a conclusory statement.

{¶31} Next, the Bruex Parties assert that the parties did not intend that the Stock Purchase Agreement's Ohio choice-of-law provision would apply to the Lease and the other exhibits simply because they were attached and incorporated therein: "The parties to those separate agreements * * * recognized that, if they wanted Ohio law to be applied to those agreements, they had to do more than attach them to the stock-purchase agreement."

{¶32} As an initial matter, this argument is flawed because it fails to acknowledge and give effect to the entire incorporation provision and the other provisions in the Stock Purchase Agreement. *See Saunders*, 101 Ohio St.3d 86, 2004-Ohio-24, at ¶ 16. All of the separate agreements were not only incorporated by reference into the Stock Purchase Agreement by their attachment thereto, they were also incorporated into the meaning of the term Agreement, and they

were a part of the Stock Purchase Agreement pursuant to the integration clause. Accordingly, the parties did "do more than attach [the Lease] to the stock-purchase agreement."

{¶33} The Bruex Parties suggest that despite the attachment of the exhibits to the Stock Purchase Agreement, the parties did not intend for the Ohio choice-of-law provision to apply to the exhibits, because two of the exhibits (the Promissory Notes and the employment agreement) contained their own Ohio choice-of-law provisions. In reply, the Woodside Parties argue that the express Ohio choice-of-law provisions in the Promissory Notes and the employment agreement are consistent with Section 10.4 of the Stock Purchase Agreement and thus do not undermine or contradict the express language in the Stock Purchase Agreement that these incorporated contracts would be governed by Ohio law. We agree. The inclusion of separate Ohio choice-of-law provisions in those two contracts does not contradict, but instead conforms to and supports the parties' intent that the incorporated exhibits were subject to the Ohio choice-of-law provision in the Stock Purchase Agreement.

{¶34} Relying upon their premise that the Lease was not incorporated into the Stock Purchase Agreement and the parties did not intend for the Lease and other exhibits to be subject to the choice-of-law provision, the Bruex Parties state that "the [L]ease failed to include an Ohio choice-of-law provision, and the reason is obvious: the parties recognized that the lease would be governed by the law of Michigan, the state in which the property was located." The Bruex Parties appear to be suggesting that the lack of a choice-of-law provision in the Lease was intentional, and that the absence of such a provision implied an intention by the parties that the Lease be governed by Michigan law.

{¶35} The Bruex Parties are essentially asking this Court to do what the trial court did and ignore the Lease's incorporation and integration into the Stock Purchase Agreement and to read

into the Lease meanings that were not placed there by the parties. *See Schultz v. Lincoln Natl. Life Ins. Co.*, 8th Dist. Cuyahoga No. 69499, 1996 WL 732449, *4 (Dec. 19, 1996). To consider the parties' purported intent in the unambiguous agreements in this matter would "in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander*, 53 Ohio St.2d at 246. We, however, will not do so, *see Schultz* at *4, because the Bruex Parties' argument contradicts a fundamental axiom of contract interpretation: "Where the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect only to the parties' expressed intentions." *Aultman Hosp. Assn.*, 46 Ohio St.3d at 53. Thus, it follows that "[i]ntentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Id. See Bellman v. Am. Internatl. Group*, 113 Ohio St.3d 323, 2007-Ohio-2071, ¶ 7, quoting *Black's Law Dictionary* 150 (8th Ed.2004). Moreover, "[t]he total absence of a provision from a written contract is evidence of an intention of the parties to exclude it rather than of an intention to include it." *Buckeye Union Ins. Co. v. Consol. Stores Corp.*, 68 Ohio App.3d 19, 25 (10th Dist.1990), citing *Cronin v. Greenwald*, 92 Ohio App. 216, 220 (1st Dist.1952), quoting 12 American Jurisprudence, Section 239, at 767. Accordingly, the Bruex Parties' argument that the parties intended for Michigan law to govern the Lease because of the absence of a choice-of-law clause in the Lease is not well-taken.

{¶36} Lastly, the Bruex Parties argue that Restatement of the Law 2d, Conflict of Laws, Section 223 (1971) applies and requires Michigan law to govern the Lease. The Woodside Parties counter that the language in the choice-of-law provision excluding the principles of conflict of laws precludes the application of the Restatement of the Law 2d, Conflict of Laws (1971). We agree that the Restatement of the Law 2d, Conflict of Laws (1971) does not apply in this matter.

**{¶37}** Choice-of-law clauses are enforceable in Ohio. *J.F. v. D.B.*, 165 Ohio App.3d 791, 2006-Ohio-1175, ¶ 17 (9th Dist.), affirmed in part and reversed in part on other grounds, 116 Ohio St.3d 363, 2007-Ohio-6750. While Ohio has adopted the Restatement of the Law 2d, Conflict of Laws (1971) in its entirety to govern choice-of-law analysis, *Am. Interstate Ins. Co. v. G & H Serv. Ctr., Inc.*, 112 Ohio St.3d 521, 2007-Ohio-608, ¶ 7-8, an analysis under the Restatement is inappropriate in this case because the parties, in the choice-of-law provision, have contracted for the exclusion of the application of the conflict of laws principles. *See Tenable Protective Servs., Inc. v. Bit E-Technologies, L.L.C.*, 8th Dist. Cuyahoga No. 89958, 2008-Ohio-4233, ¶ 18-20 (not applying Restatement of the Law 2d, Conflict of Laws, Section 187 (1971) when the choice-of-law provision indicated that the governing law was "the State of Ohio, without regard to its conflict of laws rules"), citing *Jarvis v. Ashland Oil, Inc.*, 17 Ohio St.3d 189 (1985), paragraph one of the syllabus. Accordingly, we will not apply the Restatement of the Law 2d, Conflict of Laws (1971) in this case.

**{¶38}** Lastly, the Bruex Parties rely upon *Miller v. Stuckey*, 3d Dist. Crawford No. 3-15-10, 2015-Ohio-3819, to argue that Restatement of the Law 2d, Conflict of Laws, Section 223 (1971) applies in this case because *Miller* "is, in all material ways, identical to this case." *Miller* involved a conflict of laws question as to what law governed the execution and formal requirements of the deeds that were executed on behalf of a trust in Florida for land in Ohio. *Id*. at ¶ 2, 20, 24. The trust contained a choice-of-law provision stating that Florida law would govern "[a]ll questions concerning the meaning and intention of terms of this instrument or its validity, and all questions relating to any performance under it[.]" *Id*. at ¶ 24. The *Miller* court determined that the trust's choice of-law provision as it was written did not "govern the formalities necessary for the validity of a conveyance of an interest in real property held in a Trust." *Id*. at ¶ 28.

Additionally, *Miller* noted that it "appear[ed] to be a case of first impression in Ohio and informative case law [was] scarce[.]" *Id*.

{¶39} Upon review of *Miller*, we disagree with the Bruex Parties that *Miller* "is, in all material ways, identical to this case." Rather, *Miller* is distinguishable based upon the following grounds. First, the choice-of-law language in the trust document specified the matters to which it applied. Second, *Miller* is silent as to whether the trust document incorporated the deeds into the trust or into the definition of the trust so as to permit the choice-of-law provision to extend to the deeds. Third, there is no language in the trust's choice-of-law provision excluding the conflict of laws rules. In light of these distinctions and the lack of case law regarding this issue, we do not consider *Miller* to be persuasive.

{¶40} We conclude that the Bruex Parties' interpretation that the parties intended to apply Michigan law to the Lease is not well-taken. Rather, when applying the plain, common, and ordinary meaning of the words in the Stock Purchase Agreement and the Lease, we conclude that the intent of the parties was for the Lease to be governed solely by Ohio substantive law.

{¶41} In light of the foregoing, we conclude that the trial court erred when it determined that the Lease is governed by Michigan law. The Woodside Parties' first assignment of error is sustained.

### THE WOODSIDE PARTIES' ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED IN DENYING WOODSIDE LOGIC'S MOTION FOR SUMMARY JUDGMENT ON BRUEX PROPERTIES' COUNTERCLAIM FOR BREACH OF THE LEASE ON THE GROUND THAT THE LEASE IS INVALID AND UNENFORCEABLE AND, INSTEAD, RULING AS A MATTER OF LAW THAT THE LEASE IS VALID AND ENFORCEABLE.

{¶42} The Woodside Parties contend that the trial court erred in finding that the Lease was valid and enforceable and thereby denying their summary judgment motion as to the Bruex

Properties' counterclaim for breach of the Lease. In light of our resolution of the Woodside Parties' first assignment of error, we decline to address the Woodside Parties' second assignment of error as being premature.

## THE WOODSIDE PARTIES' ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT ERRED IN DENYING WOODSIDE LOGIC'S MOTION FOR DIRECTED VERDICT ON BRUEX PROPERTIES' COUNTERCLAIM FOR BREACH OF THE LEASE, AND ENTERING JUDGMENT AFTER TRIAL IN FAVOR OF BRUEX PROPERTIES ON THIS COUNTERCLAIM.

{¶43} The Woodside Parties argue that the trial court erred when it denied their motion for directed verdict regarding the Bruex Parties' counterclaim for breach of the Lease because the Bruex Parties' past and future damages were speculative. In light of our resolution of the Woodside Parties' first assignment of error, we decline to address the Woodside Parties' third assignment of error as being premature.

## THE WOODSIDE PARTIES' ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT ERRED IN ITS INSTRUCTIONS TO THE JURY ON WOODSIDE LOGIC'S CLAIM FOR BREACH OF THE LEASE AND CONSTRUCTIVE EVICTION.

{¶44} The Woodside Parties contend that the trial court erred by giving a jury instruction for constructive eviction that contained multiple subparts which were not applicable to this case. In light of our resolution of the Woodside Parties' first assignment of error, we decline to address the Woodside Parties' fourth assignment of error as being premature.

## THE WOODSIDE PARTIES' ASSIGNMENT OF ERROR NO. 5

THE TRIAL COURT ERRED IN DENYING PLAINTIFFS' APRIL 21, 2017 MOTION FOR LEAVE TO ADD TWO ADDITIONAL EXPERT WITNESSES.

{¶45} The Woodside Parties contend that the trial court erred when it denied their motion for leave to identify additional experts regarding mitigation of damages relative to the breach of

the Lease claim. In light of our resolution of the Woodside Parties' first assignment of error, we decline to address the Woodside Parties' fifth assignment of error as being premature.

### THE WOODSIDE PARTIES' ASSIGNMENT OF ERROR NO. 6

THE TRIAL COURT ERRED IN AWARDING PREJUDGMENT INTEREST TO BRUEX PROPERTIES ON ITS CLAIM FOR BREACH OF THE LEASE.

{¶46} The Woodside Parties contend that the trial court erred when it awarded prejudgment interest on the breach of the Lease claim because the jury's damage award may have already included interest. In light of our resolution of the Woodside Parties' first assignment of error, we decline to address the Woodside Parties' sixth assignment of error as being premature.

### THE BRUEX PARTIES' ASSIGNMENT OF ERROR NO. 4

THE JURY AWARDED BRUEX PROPERTIES INADEQUATE DAMAGES AGAINST WOODSIDE LOGIC ON ITS BREACH OF LEASE CLAIM.

{¶47} The Bruex Parties contend that the damages awarded by the jury as to their breach of the Lease claim is against the manifest weight of the evidence. In light of our resolution of the Woodside Parties' first assignment of error, we decline to address the Bruex Parties' fourth assignment of error as being premature.

### THE STOCK PURCHASE AGREEMENT AND THE PROMISSORY NOTES

### THE BRUEX PARTIES' ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT, AT THE CLOSE OF PLAINTIFFS' CASE, INCORRECTLY DENIED [MR.] BRUEX'S MOTION FOR DIRECTED VERDICT ON PLAINTIFFS' CLAIMS THAT HE BREACHED THE STOCK-PURCHASE AGREEMENT.

{¶48} The Bruex Parties argue that the trial court erred in denying their motion for directed verdict on the Woodside Parties' breach of the Stock Purchase Agreement claim. Specifically, the Bruex Parties argue that the Woodside Parties failed to present any evidence

regarding what land was subject to the environmental warranty and that there were hazardous substances present on the property at the time the Stock Purchase Agreement was signed or on the closing date. We disagree with both arguments.

{¶49} A motion for directed verdict tests the legal sufficiency of the evidence supporting a claim. *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68 (1982). Stated another way, this motion tests whether the evidence presented is sufficient to create a jury issue. *Id.* While disposition of a Civ.R. 50(A) motion involves reviewing the evidence, it does not present factual issues. *O'Day v. Webb*, 29 Ohio St.2d 215 (1972), paragraph three of the syllabus. Rather, "[a] motion for directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence." *Ruta* at 69. Thus, we review a trial court's ruling on a motion for directed verdict de novo. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 4.

{¶50} Under Civ.R. 50(A)(4), a motion for directed verdict can only be granted when, having construed the evidence most strongly in favor of the nonmoving party, the court concludes that reasonable minds could only reach one conclusion upon the evidence submitted and that conclusion is adverse to the nonmoving party. Conversely, the motion must be denied when there is substantial competent evidence supporting the position of the nonmoving party and reasonable minds might reach different conclusions. *Hawkins v. Ivy*, 50 Ohio St.2d 114, 115 (1977).

{¶51} "The 'reasonable minds' test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Goodyear Tire & Rubber Co.* at ¶ 3. The nonmoving party "is entitled to have the trial court construe the evidence in support of its claim as truthful, giving it its most favorable interpretation, as well as having the benefit of all reasonable inferences drawn from

that evidence." *Gibson v. Drainage Prods., Inc.*, 95 Ohio St.3d 171, 2002-Ohio-2008, ¶ 21, citing *Ruta* at 68. *Accord Hargrove v. Tanner*, 66 Ohio App.3d 693, 695 (9th Dist.1990). However, neither the weight of the evidence or the credibility of the witnesses are matters for the court's consideration under Civ.R. 50(A). *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 119 (1996), quoting *Ruta* at 68-69.

{¶52} When a defendant makes a motion for directed verdict at the close of plaintiff's case and renews the motion at the completion of the case (as the Bruex Parties did in this case), an appellate court will only consider the evidence presented during the plaintiff's case-in-chief to determine whether a directed verdict should have been granted. *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 20; 89 Ohio Jurisprudence 3d, Trial, Section 212 (June 2020 Update).

{¶53} The Woodside Parties claim that Mr. Bruex breached the Stock Purchase Agreement by breaching Section 3.21, a representation and warranty by Mr. Bruex that there was no hazardous substance on the Kilgore Road property. Namely, the Woodside Parties assert that there was lead and copper in the drinking water, lead and arsenic in the soil of the leach field of the septic system, lead and silver in the septic system, and selenium in a soil pile. They further assert that the presence of these hazardous substances on the Kilgore Road property breached the environmental warranty and representation that there was no hazardous substance present in or on the Kilgore Road property on the date the Stock Purchase Agreement was signed, October 25, 2011, or on the closing date, October 31, 2011.

{¶54} Pursuant to Section 3.21(b) of the Stock Purchase Agreement, Mr. Bruex warranted and represented the following:

> There is no Hazardous Substance present on or in the environment at the Properties Owned by the Company or to the knowledge of Shareholder or the Company at any geologically or hydrologically adjoining property, including any Hazardous Substance contained in barrels, above or underground storage tanks, landfills, land

deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Properties Owned or such adjoining property, or incorporated into any structure therein or thereon. No Shareholder, the Company, or any other person for whose conduct they are or may be held responsible, has permitted or conducted, or is aware of, any hazardous activity conducted with respect to the Properties Owned or any other properties or assets (whether real, personal, or mixed) in which Shareholder or the Company has or had an interest except in full compliance with all applicable Environmental Laws.

The Stock Purchase Agreement defined "Shareholder" as Mr. Bruex and the "Company" as Industrial Logic Controls, Inc. while it was owned by Mr. Bruex. Section 3.21 further defined "Properties Owned" as "those properties owned, operated or managed by the Company." "Hazardous Substance" was defined to "mean[] any substance presently listed, defined, designated or classified as hazardous, toxic, radioactive or dangerous, or otherwise regulated as such, under any Environmental Law, whether by type or by quantity, including any material regulated as such because it contains any such substance as a component." This included "petroleum or any derivative or by-product thereof, asbestos, radioactive material, and polychlorinated biphenyls."

### Evidence regarding what property was subject to the environmental warranty and representation

{¶55} The Bruex Parties first contend that there was no evidence regarding what part of the 11-acre parcel was included in the prior lease and thus subject to the environmental warranty and representation. An element essential to the Woodside Parties' claim for breach of the Stock Purchase Agreement arising from an alleged violation of the environmental warranty is the identification of the land subject to the warranty. Thus, the Woodside Parties must produce evidence or "evidence of a fact upon which a reasonable inference may be predicated to support such element." *See Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981).

{¶56} Section 3.21 of the Stock Purchase Agreement specifies that properties owned, operated or managed by Industrial Logic Controls, Inc. prior to the execution of the Stock Purchase

Agreement were subject to the environmental warranty and representation. It is the Woodside Parties' position that the Kilgore Road property, which consists of 11 acres[2] located at 7136 East Kilgore Road, in Kalamazoo, Michigan, was the property owned, operated, or managed by Industrial Logic Controls, Inc. and thus subject to the environmental warranty and representation.

{¶57} Mr. Bruex testified that Industrial Logic Controls, Inc. was formed in 1987 and he became the sole owner in 1989 or 1990. In 1992, he purchased 1.5 acres at 7136 East Kilgore Road which was part of a larger 11-acre parcel. A few years later, the remainder of the 11-acre parcel became available, and Mr. Bruex purchased it also. The entire parcel is owned by the Bruex Trust and managed by Bruex Properties.

{¶58} Upon purchasing the 1.5 acres, Mr. Bruex had a building and an asphalt parking lot and driveway constructed on that parcel. Additionally, he installed a well and a septic system. In 1998, he built an addition to the building.

{¶59} Industrial Logic Controls, Inc. moved into the building in March 1992, and its business operations remained there until March 2014. Mr. Bruex testified that Industrial Logic Controls, Inc. was a tenant at the Kilgore Road property throughout this period of time.

{¶60} During trial, Mr. Bruex testified that he owned the property. He acknowledged that Industrial Logic Controls, Inc. had a triple net lease, but denied that Industrial Logic Controls, Inc. managed or operated the property. Counsel for the Woodside Parties impeached Mr. Bruex with his deposition testimony wherein he testified that Industrial Logic Controls, Inc., as the tenant, was managing and operating the Kilgore Road property under a triple net lease. *See Keeney v. SuperAmerica*, 4th Dist. Lawrence No. 97 CA 4, 1998 WL 102992, *5 (Mar. 5, 1998) (relying

---

[2] We recognize that the parties and the evidence refer to the entire parcel as being 10 acres, 11 acres, and 13 acres. This discrepancy does not impact our analysis.

upon Evid.R. 613(B) and 801(D)(1)(a) to permit consideration of deposition excerpts as substantive evidence).

{¶61} Mr. Bruex explained that a triple net lease included payments for rent, taxes, insurance, and maintenance of the property. There was no further testimony in the Woodside Parties' case-in-chief regarding the payment of property taxes by Industrial Logic Controls, Inc. prior to October 31, 2011. However, in their response brief on appeal, the Woodside Parties attempt to rely upon testimony presented in the Bruex Parties' case-in-chief from Mr. Bruex and Industrial Logic Controls, Inc.'s president in 2011 regarding what acres were included in the tax payments under that lease. We, however, cannot consider such evidence as it was not a part of the Woodside Parties' case-in-chief. *See Williams*, 107 Ohio St.3d 203, 2005-Ohio-6268, at ¶ 20; 89 Ohio Jurisprudence 3d, Trial, Section 212 (June 2020 Update).

{¶62} Schedule 3.21 of the Stock Purchase Agreement referred to a Phase I environmental site assessment. Mr. Rogers testified that the Phase I assessment by Villa was being done "with respect to the property on Kilgore Road where [Industrial Logic Controls, Inc.] operated" and that was the only place that Industrial Logic Controls, Inc. operated. Additionally, he testified that for purposes of the Stock Purchase Agreement's environmental warranty, the parties agreed that the Kilgore Road property was owned, operated or managed by Industrial Logic Controls, Inc.

{¶63} Mr. Bruex testified that he hired Villa to perform the Phase I assessment as to the Kilgore Road property only. He further testified that the environmental warranty applied to the Kilgore Road property, which was the same property upon which Villa conducted the Phase I assessment:

Q: No question in your mind that [the] representations and warranties you're making here relate to the Kilgore Road property, true?

A: It relates to the Villa environmental. Phase I was that property, yes.

Q:      I'm not talking about the Villa Phase I, but you're correct.  It related to that property.

I'm saying the representations and warranties you're making about the environmental condition of the property were with respect to the Kilgore Road property, isn't that true?  I just want to be clear.

A:      The representations -- yeah.  I mean, we had a Phase I.  Yes, it would be related to the Kilgore Road property.

{¶64} With respect to the scope of the services to be provided, the Villa Phase I report, dated October 6, 2011, stated Villa was hired by Mr. Bruex to perform a Phase I assessment "for the property located at 7136 N[.] Avenue E[.], Kalamazoo, Kalamazoo County, Michigan." Section 1.0 of the Villa Phase I report clarified that the "subject property consist[ed] of approximately 10 acres and [was] located at 7136 N[.] Avenue E[.] (Kilgore Road), Kalamazoo, Kalamazoo County, Michigan."  This section further indicated a building, septic tank, and water well were present on the property.  The Villa Phase I report identified Industrial Logic Controls, Inc. as the tenant that was currently using the property.

{¶65} As part of the Phase I assessment, Villa performed a site walkover which allowed for visual and physical observations of the property.  The site walkover described the property as "an area [of] approximately 10 acres" with the "site around the building [being] landscaped, while the south half of the property [was] woods and golden rod fields."  The report included an appendix of maps and aerial photographs of the property.  Additionally, there were photographs depicting various locations on the property, both inside and outside of the building.  The outside photographs included pictures of the field south of the building, the septic tank location, a view of landscape mounds, and a wood pile in a field.

{¶66} Mr. Bruex testified that upon notification from Mr. Rogers in February 2014 regarding the presence of hazardous substances on the Kilgore Road property, he gave Mr. Rogers

permission to perform additional environmental testing of the property. There were no limitations placed regarding where the samples would be collected on the Kilgore Road property. Additional samples were collected simultaneously by FTC&H and Villa from various locations on the Kilgore Road property, including drinking water from the well, soil from the leach bed, and groundwater near the leach bed.

{¶67} The Bruex Parties argue that their motion for directed verdict should have been granted because the Woodside Parties failed to present sufficient evidence that the contaminated dirt pile and leach bed were on the property owned, operated or managed by Industrial Logic Controls, Inc, namely 1.5 acres at 7163 Kilgore Road. They suggest that the environmental warranty applied only to 1.5 acres and not the entire 11-acre parcel. As the prior lease was not in evidence, the Bruex Parties relied upon the Lease and the Stock Purchase Agreement to infer that the land in the prior lease was the same 1.5 acres described in the subsequent Lease.

{¶68} Although framed as a sufficiency argument, this argument presents an underlying factual dispute and asks this Court to weigh the evidence regarding whether the environmental warranty applied to the entire 11-acre parcel or only 1.5 acres of the parcel. A motion for directed verdict, however, does not present factual issues, nor does it involve weighing the evidence. *Ruta*, 69 Ohio St.2d at 68-69. Rather, "[a] motion for directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence." *Id.* at 69. Thus, this Court's role when reviewing the Bruex Parties' motion for directed verdict is to consider whether there is "any evidence of substantial probative value in support" of the Woodside Parties' claim that the land subject to the environmental warranty was the 11-acre parcel. *See id.*

{¶69} We conclude that, viewing the evidence in the light most favorable to the Woodside Parties, there was sufficient, credible evidence supporting the Woodside Parties' position that the entire 11-acre parcel was owned, operated, or managed by Industrial Logic Controls, Inc. and subject to the environmental warranty, and reasonable minds might reach different conclusions. To the extent that the trial court denied the motion for directed verdict based upon this argument, the trial court did not err.

### Evidence of hazardous substances present in 2011

{¶70} The Bruex Parties next argue that there was no evidence of hazardous substances present on the Kilgore Road property on October 31, 2011, the closing date of the Stock Purchase Agreement. To clarify, the Bruex Parties are not challenging the evidence regarding whether the named substances were hazardous. Rather, the Bruex Parties are challenging whether there was any evidence that as of October 31, 2011 there were hazardous substances present on the Kilgore Road property. The Woodside Parties concede that there was no direct evidence as to this essential element of their claim and instead they relied entirely upon circumstantial evidence.

{¶71} In order to survive a motion for directed verdict, the plaintiff must produce evidence or "evidence of a fact upon which a reasonable inference may be predicated to support such element." *See Strother*, 67 Ohio St.2d at 285. Circumstantial evidence possesses the same probative value as direct evidence. *Massey v. Riser Foods, Inc.*, 9th Dist. Lorain No. 98CA007260, 2000 WL 670669, *2 (May 24, 2000), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus.

{¶72} Circumstantial evidence is a fact proven by direct evidence that leads to the reasonable inference drawn from that evidence. *State v. Rohr-George*, 9th Dist. Summit No. 23019, 2007-Ohio-1264, ¶ 21; *Busch v. Premier Integrated Med. Assocs., Ltd.*, 2d Dist.

Montgomery No. 19364, 2003-Ohio-4709, ¶ 57. An inference is reasonable when it is drawn from facts in evidence, while an inference is unreasonable or speculative when it is not supported by facts in evidence. *See Rohr-George* at ¶ 21; *Ray v. Wal-Mart Stores, Inc.*, 4th Dist. Washington No. 12CA21, 2013-Ohio-2684, ¶ 35.

{¶73} An inference upon an inference, also referred to as the stacking of inferences, is prohibited. *See Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329 (1955), paragraph one of the syllabus. *See Orndorff v. Aldi, Inc.*, 115 Ohio App.3d 632, 636-637 (9th Dist.1996). This rule prohibits the drawing of one inference solely and entirely from another inference, where that inference is unsupported by any additional facts or inferences drawn from other facts. *Hurt* at paragraph one of the syllabus. However, a parallel inference, which is a reasonable inference based in part upon another inference and in part upon additional facts, is permissible. *Id.* at paragraph two of the syllabus. Also, the drawing of multiple inferences separately from the same set of facts is allowed. *McDougall v. Glenn Cartage Co.*, 169 Ohio St. 522 (1959), paragraph two of the syllabus. *Accord State v. Hilton*, 9th Dist. Summit No. 21624, 2004-Ohio-1418, ¶ 17.

{¶74} Based upon the Phase II assessment conducted in 2014 by ERM, the Woodside Parties have identified a number of hazardous substances as being present on the Kilgore Road property prior to October 31, 2011. They correctly assert that they only need to present substantial probative evidence as to one of the hazardous substances in order to survive the Bruex Parties' motion for directed verdict. We will examine the evidence pertinent to each of the hazardous substances outlined in the Woodside Parties' brief.

**Lead and arsenic in the soil**

{¶75} Mr. Bruex testified that in 1992 he purchased 1.5 acres at 7136 East Kilgore Road, which was part of a larger 11-acre parcel. A few years later, he purchased the remainder of the

lot. Mr. Bruex stated that the Kilgore Road property was previously farmland. The Villa Phase I report also identified the Kilgore Road property as having been used for agricultural purposes.

{¶76} On March 12, 2014, Villa sent a letter to Mr. Bruex summarizing the results of the testing that was completed to verify the findings by ERM in their Phase I and Phase II assessments. In this letter, Villa again classified the Kilgore Road property as agricultural and noted that "[h]istorically lead-arsenate was used as an agricultural pesticide[.]"[3]

{¶77} The Bruex Parties argue that the Woodside Parties' foregoing evidence employs the prohibited stacking of inferences rule. We disagree. Rather, this evidence involves parallel inferences. *See Hurt*, 164 Ohio St. 329, at paragraph two of the syllabus.

{¶78} There are four pertinent facts in evidence: (1) Mr. Bruex purchased the Kilgore Road property in 1992; (2) the Kilgore Road property was previously farmland/agricultural land; (3) pesticides were used on agricultural lands; and (4) lead-arsenate was used as an agricultural pesticide. The first reasonable inference is that pesticides were used on the Kilgore Road property. This inference is based upon the second and third facts. The second reasonable inference is that the Kilgore Road property contained lead-arsenate prior to 1992. The second inference is based upon the first reasonable inference and the first and fourth facts.

{¶79} A motion for directed verdict requires this Court to allow the Woodside Parties "all reasonable inferences from the evidence to support the claim." *See Hargrove*, 66 Ohio App.3d at 695. *See also Gibson*, 95 Ohio St.3d 171, 2002-Ohio-2008, at ¶ 21, citing *Ruta*, 69 Ohio St.2d at 68. By using parallel inferences, the Woodside Parties have presented substantial, competent

---

[3] In their appellee brief, the Woodside Parties relied upon the testimony of Villa's president. We cannot consider this testimony because it was not presented in the Woodside Parties' case-in-chief. *See Williams*, 107 Ohio St.3d 203, 2005-Ohio-6268, at ¶ 20; 89 Ohio Jurisprudence 3d, Trial, Section 212 (June 2020 Update).

circumstantial evidence demonstrating the presence of the hazardous substances, lead and arsenic, in the soil at the Kilgore Road property prior to October 31, 2011.

**Selenium in the soil pile**

{¶80}   ERM conducted a Phase I assessment and issued a report in November 2013.  This report identified "a pile of soil with cement blocks and broken asphalt * * * on the east side of the Site, east of the dumpsters" as a "de minimis condition" of the Kilgore Road property.  The Phase I report indicated the soil pile was "50 foot by 10 foot" and its origin was "unknown."

{¶81}   The Woodside Parties rely upon the ERM Phase I report and the testimony of the ERM Senior Engineer who conducted the Phase I assessment as evidence to create an inference that the soil pile was present prior to October 31, 2011.  The ERM Senior Engineer testified that as part of the Phase I assessment he spoke to the manager of Industrial Logic Controls, Inc. regarding this soil pile with the construction materials.  Referring to the ERM Phase I report, the ERM Senior Engineer testified that the manager of Industrial Logic Controls, Inc. "did not know the origin of the concrete blocks or broken asphalt and indicated it was likely generated during site development."  The statement by the manager of Industrial Logic Controls, Inc. that he did not know the origin of the construction materials but it was "likely" from the site development is conjecture and does not support a reasonable inference that the soil pile was present prior to October 31, 2011.

{¶82}   Additionally, the Woodside Parties rely upon testimony regarding the size of the trees on the soil pile as evidence to establish an inference that the soil pile was present prior to October 31, 2011.  The ERM Phase I report included a picture of the soil pile containing the construction debris and various trees growing on the pile.  The ERM Senior Engineer testified regarding the approximate size of the trees:  the one on the far right side of the picture was

approximately eight to twelve inches in diameter, and the one next to it was approximately four to six inches in diameter. The ERM Senior Engineer testified that the size estimations of the trees "[c]ould" line up with the timeline given by the manager of Industrial Logic Controls, Inc. regarding the source of the soil pile.

{¶83} Similarly, a certified industrial hygienist testified regarding the size of the trees. While the certified industrial hygienist went to the Kilgore Road property, he did not actually see the soil pile with the trees because there was a blizzard. Instead, he relied solely upon the picture of the soil pile contained in the ERM Phase I report. Based upon that picture, the certified industrial hygienist testified that the trees on the soil pile were "fairly big." He also conceded that he did not know what kind of trees were depicted in the soil pile. When asked, "could those trees have grown in two years and six months?" he responded "I don't think so." The testimony from both of these witnesses regarding the size and growth rates of the trees on the soil pile was speculative and did not create a reasonable inference that the soil pile was present on the Kilgore Road property prior to October 31, 2011.

{¶84} ERM conducted a Phase II assessment in January 2014. One of the "main objectives" was to "assess the composition" of the soil pile. The Phase II report described the soil pile as being "comprised of topsoil, sand, gravel, concrete blocks and broken asphalt." The Phase II report identified the metal, selenium, as being detected in the soil pile. The ERM Senior Engineer testified that the soil pile was approximately 200 to 300 feet away from the building, on the other side of the driveway.

{¶85} Mr. Bruex testified that in 1992 he constructed a building and an asphalt driveway and parking lot on the 1.5-acre parcel. In 1998, Mr. Bruex built an addition to the building. There

has been no further construction at the Kilgore Road Property. Mr. Bruex was unaware of anyone dumping anything on the Kilgore Road Property.

{¶86} Based upon Mr. Bruex's testimony regarding his prior construction activities and the ERM Phase II report describing the location and composition of the soil pile, a reasonable inference can be drawn that the cement blocks and asphalt in the soil pile were from the construction in 1992 and 1998. Using this reasonable inference along with the evidence that selenium was found in the soil pile, a parallel inference can be drawn that selenium was present on the Kilgore Road property prior to October 31, 2011.

{¶87} Accordingly, the Woodside Parties have presented substantial, competent circumstantial evidence demonstrating the presence of a hazardous substance, selenium, in the soil pile at the Kilgore Road property prior to October 31, 2011.

**Lead and copper in the drinking water**

{¶88} The Woodside Parties argue that there were several experts who testified regarding "the natural development of lead and copper in the aquifer, leading to lead in the drinking water." They rely upon the testimony of the ERM Partner and the Bruex Parties' environmental consultant expert. We will not consider the testimony of the Bruex Parties' environmental consultant expert because that testimony was not presented in the Woodside Parties' case-in-chief. *See Williams*, 107 Ohio St.3d 203, 2005-Ohio-6268, at ¶ 20; 89 Ohio Jurisprudence 3d, Trial, Section 212 (June 2020 Update). As to the ERM Partner, the Woodside Parties have mischaracterized his testimony.

{¶89} The ERM Partner testified that the soils and materials in southwest Michigan were deposited there by glaciation. The ERM Partner stated that the city of Kalamazoo is in the lower left-hand quadrant of the state of Michigan. All of the assessments performed on the Kilgore Road property indicated it is located in the city of Kalamazoo. The ERM Partner agreed that lead and

copper are naturally occurring in southwestern Michigan and testified that based upon his work at ERM, he has seen lead and copper in the soil of southwestern Michigan. However, this witness was unable to testify as to the depth of these materials and soils because he was not a geologist. All of the ERM Partner's testimony concerned lead and copper in the soil at surface levels, and not at deeper levels to reach the aquifers.

{¶90} While there was sufficient evidence to establish a reasonable inference through parallel inferences that the Kilgore Road property had lead and copper *in the soil* prior to October 31, 2011, there was no evidence to create a reasonable inference that the Kilgore Road property had lead and copper *in the drinking water* prior to October 31, 2011, the conclusion sought by the Woodside Parties. The only way to reach that conclusion is through the stacking of inferences, which is prohibited. The Woodside Parties' inference was unreasonable.

{¶91} Accordingly, the Woodside Parties failed to present substantial, competent circumstantial evidence demonstrating the presence of the hazardous substances, lead and copper, in the drinking water at the Kilgore Road property prior to October 31, 2011.

**Lead and silver in the septic tank**

{¶92} As to the lead and silver in the septic tank, the Bruex Parties first contend that the environmental warranty does not apply because Michigan Part 201 of Act 451 of 1994 has no application to septic effluent. We will not address this particular argument as they have raised it for the first time in their reply brief. *See In re Songer*, 9th Dist. Lorain No. 01CA007841, 2001 WL 1162831, *6 (Oct. 3, 2001).

{¶93} While the heading in the Woodside Parties' brief identified lead and silver in the septic tank, they only presented arguments regarding evidence of silver. Accordingly, we will limit our review to silver in the septic tank.

{¶94} Mr. Bruex testified that he owned another company, Universal Formulas. This business sublet 1,000 square feet from Industrial Logic Controls, Inc. at the Kilgore Road property both before and after October 31, 2011. Universal Formulas ceased operation in 2016. Mr. Bruex described Universal Formulas as a distributor of health supplements and, at one time, it sold colloidal silver in liquid form.

{¶95} Mr. Bruex and the ERM Senior Engineer explained that the septic system was an underground tank. The septic system was considered a closed system which meant the contents of the septic tank could only enter from the building's drains.

{¶96} While the facts established that colloidal silver was present at the Kilgore Road property in the warehouse, there were no facts upon which to infer that the silver was present before October 31, 2011. Nor were there any facts to allow an inference that the presence of colloidal silver in the warehouse resulted in the colloidal silver entering the septic tank through the building's drains. The Woodside Parties' inference was unreasonable.

{¶97} Based upon the foregoing, the Woodside Parties failed to present substantial, competent circumstantial evidence demonstrating the presence of the hazardous substances, lead and silver, in the septic system at the Kilgore Road property prior to October 31, 2011.

**Conclusion**

{¶98} We conclude that, viewing the evidence in the light most favorable to the Woodside Parties, there was substantial, competent circumstantial evidence supporting the Woodside Parties' position that as of October 31, 2011 there was at least one hazardous substance on the Kilgore Road property and reasonable minds might reach different conclusions. To the extent that the trial court denied the Bruex Parties' motion for directed verdict based upon this argument, the trial court did not err.

{¶99} The Bruex Parties' first assignment of error is overruled.

**THE WOODSIDE PARTIES' ASSIGNMENT OF ERROR NO. 8**

THE TRIAL COURT ERRED IN ITS INSTRUCTION ON [MR.] BRUEX'S DEFENSE TO WOODSIDE MANAGEMENT'S BREACH OF THE [STOCK PURCHASE AGREEMENT] CLAIM.

{¶100} The Woodside Parties contend that the trial court erred in charging the jury on the law as to the breach of the Stock Purchase Agreement.

{¶101} A trial court is obligated to provide a jury with instructions that reflect a correct and complete statement of the law. *Sharp v. Norfolk & W. Ry. Co.*, 72 Ohio St.3d 307, 312 (1995). This Court applies a de novo standard of review to determine whether jury instructions accurately reflect the law. *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 22.

{¶102} The Woodside Parties allege that the trial court erred by misinterpreting the contract language in Section 8.4(c) of the Stock Purchase Agreement and using it as part of the jury instruction for the breach of the Stock Purchase Agreement claim. Section 8.4(c) of the Stock Purchase Agreement is an indemnification clause relative to a breach of warranty under the Stock Purchase Agreement. The indemnification clause reads as follows:

> An Indemnitor shall **have no Liability** (for indemnification or otherwise) with respect to Claims related to a breach of a representation or warranty **until the total of all damages** with respect to such matters (aggregating all such matters as to such Indemnitor) **exceeds Twenty Thousand Dollars ($20,000.00) in the aggregate and then only for the amount by which such damages exceed Twenty Thousand Dollars ($20,000.00)[.]**

(Emphasis added.) The disputed portion of the jury instruction referenced Section 8.4(c) and described the indemnification clause as follows:

> Finally, Andrew Bruex argues that even if the property was owned, operated or managed by Woodside Logic and there was a hazardous substance present on the property when the transaction closed, under Section 8.4(c) of the stock purchase

agreement, there would have been **no breach of the stock purchase agreement until after Woodside Management had paid more than $20,000 to clean up or otherwise deal with the hazardous substance**, and Mr. Bruex had refused to reimburse * * * Woodside Management for the amount in excess of $20,000 that it had paid to clean up or otherwise deal with that hazardous substance.

(Emphasis added.) This instruction was proposed by the Bruex Parties and accepted by the trial court over the Woodside Parties' timely objection that this jury instruction misinterpreted the indemnification clause.

{¶103} The Woodside Parties only argue that the misinterpretation occurred in the following phrase: "there would have been no breach of the stock purchase agreement until after Woodside Management had paid more than $20,000 to clean up or otherwise deal with the hazardous substance[.]" They contend this phrase contradicts Section 8.4(c) because the indemnification clause "does not require Woodside Management to first spend money to clean up prior to a breach occurring." They conclude that this misinterpretation of Section 8.4(c) "misled the jury in their determination of the damages and setoff amount awarded to Woodside Management."

{¶104} The Bruex Parties assert that this issue is moot because the jury instruction at issue only addresses liability and the jury found in favor of the Woodside Parties on the breach of the Stock Purchase Agreement. Further, they argue there was no prejudice to the Woodside Parties because the trial court did not give this instruction to the jury as part of the damage instructions.

{¶105} Upon review of the entire jury instruction for the breach of the Stock Purchase Agreement, we agree that the portion of the instruction disputed herein addresses the issue of liability and not damages. This disputed instruction was contained in the liability portion of the jury instruction regarding the breach of the Stock Purchase Agreement and addressed when Mr. Bruex would become liable for damages to Woodside Management under the indemnification

provision. This instruction did not tell the jury to apply or use the $20,000 paid by Woodside Management when calculating the damages. Rather, there was an instruction in the damages portion that directed the jury on how to calculate the damages. The damages instruction given by the trial court mirrored the Woodside Parties' proposed damages instruction.

{¶106} In light of the jury's verdict finding Mr. Bruex liable under the Stock Purchase Agreement, the Woodside Parties' challenge to this jury instruction is moot and we decline to address the merits of the Woodside Parties' eighth assignment of error. *See* App.R. 12(A)(1)(c).

### THE WOODSIDE PARTIES' ASSIGNMENT OF ERROR NO. 7

THE TRIAL COURT ERRED IN ENTERING JUDGMENT IN THE AMOUNT OF $74,000 IN FAVOR OF [MR.] BRUEX AGAINST WOODSIDE MANAGEMENT ON MR. BRUEX'S COUNTERCLAIM FOR BREACH OF NOTES.

{¶107} The Woodside Parties argue that the trial court erred when it found the jury's verdicts regarding the breach of the Stock Purchase Agreement and breach of the Promissory Notes and the interrogatory regarding the setoff amount were inconsistent and entered a judgment that was not consistent with the jury's verdict. We agree.

{¶108} Interrogatories are used to test the correctness of the general verdict. *Colvin v. Abbey's Restaurant, Inc.*, 85 Ohio St.3d 535, 538 (1999); *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.*, 28 Ohio St.3d 333, 336-337 (1986), citing *Davison v. Flowers*, 123 Ohio St. 89, 96 (1930). Civ.R. 49(B) sets forth the procedures a trial court must follow when the parties submit interrogatories for the jury to complete in their deliberations at trial. When a general verdict and the jury's answers to interrogatories are consistent, Civ.R. 49(B) requires the trial court to enter the appropriate judgment upon the verdict pursuant to Civ.R. 58. However, when one or more of the answers to interrogatories is inconsistent with the general verdict the trial court may, in its discretion, proceed with one of the following options:  (1) enter judgment based upon the

interrogatory answers, notwithstanding the general verdict, (2) return the jury for additional consideration of the interrogatories and the general verdict, or (3) order a new trial. *Colvin* at paragraph one of the syllabus; Civ.R. 49(B).

{¶109} Before applying one of the options in Civ.R. 49(B), the trial court must determine that apparent inconsistencies between the interrogatory answers and the general verdict are irreconcilable. *Lynch v. Greenwald*, 9th Dist. Summit No. 26083, 2012-Ohio-2479, ¶ 7, quoting *Capital Control, Inc. v. Sunrise Point, Ltd.*, 6th Dist. Erie Nos. E-03-046, E-04-008, 2004-Ohio-6309, ¶ 34. The trial court is tasked with "mak[ing] every reasonable effort to reconcile" the inconsistent interrogatory answers and the general verdict. *Gregg v. The Kroger Co.*, 2d Dist. Champaign No. 90 CA 12, 1991 WL 64985, *4 (Apr. 19, 1991). This requires the trial court to examine the interrogatories and answers as a whole and to entertain all reasonable hypotheses that would reconcile the interrogatory answers and the general verdict. *Id.*, quoting *Wells v. Baltimore & Ohio RR. Co.*, 58 Ohio Laws Abs. 225, 227 (2d Dist.1949). The "trial court's efforts to reconcile interrogatory answers with the general verdict" are reviewed for an abuse of discretion." *Lewis v. Nease*, 4th Dist. Scioto No. 05CA3025, 2006-Ohio-4362, ¶ 48, citing *Bicudo v. Lexford Properties, Inc.,* 157 Ohio App.3d 509, 2004-Ohio-3202, ¶ 68 (7th Dist.), citing *Tasin v. SIFCO Industries, Inc.*, 50 Ohio St.3d 102 (1990), paragraph one of the syllabus. "'A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by evidence, or grossly unsound.'" *Menke v. Menke*, 9th Dist. Summit No. 27330, 2015-Ohio-2507, ¶ 8, quoting *Tretola v. Tretola*, 3d Dist. Logan No. 8-14-24, 2015-Ohio-1999, ¶ 25.

{¶110} As the reviewing court, we must "'analyze all of the questions and answers in the light of the totality of the circumstances' and determine whether the trial court reasonably interpreted such answers in order to reconcile them with the general verdict." *Lewis* at ¶ 48,

quoting *Larch v. Athens*, 4th Dist. Athens No. CA-954, 1978 WL 214288, *4 (Dec. 12, 1978). This includes construing the interrogatory answers in conjunction with the jury instructions. *See Becker v. BancOhio Natl. Bank*, 17 Ohio St.3d 158, 160-161 (1985). *See also First Natl. Bank of Omaha v. iBeam Solutions, LLC*, 10th Dist. Franklin No. 13AP-850, 2016-Ohio-1182, ¶ 51, 54. "A court should attempt to reconcile the general verdict and interrogatory answer whenever possible." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 9th Dist. Summit No. 25632, 2017-Ohio-7846, ¶ 9, citing *Otte v. Dayton Power & Light Co.*, 37 Ohio St.3d 33, 41 (1988). *See Chambers v. Admr., Ohio Bur. of Workers' Comp.*, 164 Ohio App.3d 397, 2005-Ohio-6086, ¶ 21 (9th Dist.), quoting *Klever v. Reid Bros. Express, Inc.*, 151 Ohio St. 467, 474 (1949); *Ragone v. Sentry Ins. Co.,* 121 Ohio App.3d 362, 370 (8th Dist.1997).

{¶111} After the jury's verdicts and interrogatory answers were read in open court, the Bruex Parties raised an objection that there was an inconsistency between Interrogatory No. 2 and Verdict Form No. 2. The Bruex Parties argued that the verdict in favor of Woodside Management on the breach of the Promissory Notes claim and the zero damage award were inconsistent with the jury's answer to Interrogatory No. 2 that Woodside Management was "justified" in setting off $48,940 from the Promissory Notes. After much debate amongst the parties and the trial court, and over the repeated objections by the Woodside Parties, the trial court agreed there was an inconsistency that only the jury could reconcile. The trial court returned the jury for further deliberations with instructions to answer an additional interrogatory titled "Request for Clarification[.]" The "Request for Clarification" interrogatory asked "Is Andrew Bruex entitled to any money not set off from the Promissory Notes?" to which the jury answered "Yes[.]" Based upon the jury's response to the clarification interrogatory, the trial court entered judgment in favor of Mr. Bruex in the amount of $74,000 on the breach of Promissory Notes claim.

{¶112} The Woodside Parties contend that the trial court found Verdict Form No. 1 and Verdict Form No. 2 to be inconsistent. The trial transcript and the trial court's order entering judgment on the jury verdicts reflect otherwise. The trial court found Interrogatory No. 2 and Verdict Form No. 2 to be inconsistent. While it is necessary to examine Verdict Form Nos. 1 and 2 and Interrogatory Nos. 1-4,[4] we will limit our discussion to whether Interrogatory No. 2 was inconsistent with Verdict Form No. 2.

### Woodside Management's Claim for Breach of the Stock Purchase Agreement
### Verdict Form No. 1 and Interrogatory Nos. 1 and 2

{¶113} In this claim, Woodside Management alleged that Mr. Bruex breached the Stock Purchase Agreement, Section 3.21, wherein Mr. Bruex warranted and represented there was no hazardous substance on the Kilgore Road property as of October 31, 2011. In accordance with Section 8.3 of the Stock Purchase Agreement, Woodside Management exercised its right to set off by deducting its damages incurred as a result of Mr. Bruex's breach from the amount due on the Promissory Notes. Woodside Management deducted $102,940 from the balance due on the Promissory Notes and paid the balance in April 2014. In Interrogatory Nos. 1 and 2, the jury was asked to decide whether Mr. Bruex breached Section 3.21 of the Stock Purchase Agreement, and if so, what amount of damages Woodside Management was allowed to set off from the Promissory Notes.

{¶114} In Verdict Form No. 1, the jury found in favor of Woodside Management on its claim for breach of the Stock Purchase Agreement and stated "Setoff: $48,940." Interrogatory

---

[4] There were five verdict forms and eight interrogatories in this case.

Nos. 1 and 2 were specifically directed toward Verdict Form No. 1. These two interrogatories asked the jury the following questions:

> Jury Interrogatory No. 1
>
> Do you find by a preponderance of the evidence that the property located at 7136 East Kilgore Road, Kalamazoo, MI 49001 (aka. 7136 East N[.] Avenue, Kalamazoo, MI 49048) contained one or more Hazardous Substances as defined in the Stock Purchase Agreement at the time of closing that agreement?

Six jurors circled "Yes" and two jurors circled "No."

> Jury Interrogatory No. 2
>
> * * *
>
> If you found that Hazardous Substances existed on the property, what is the amount that Woodside Management was justified to set off from the Promissory Notes?
>
> * * *
>
> Amount of setoff: $48,940.00
> *(this amount must also appear in Verdict Form No. 1)*

(Emphasis in original.)

**{¶115}** Interrogatory No. 1 instructed the jurors to sign Verdict Form No. 1 and mark the appropriate box based upon their answer to that interrogatory. Interrogatory No. 2 indicated that the amount listed in that interrogatory for setoff must also appear on Verdict Form No. 1. Verdict Form No. 1 had corresponding language instructing the jurors to insert the amount from Interrogatory No. 2 on the line for the setoff amount.

### Mr. Bruex's Claim for Breach of the Promissory Notes
### Verdict Form No. 2 and Interrogatory Nos. 3 and 4

**{¶116}** In this claim, Mr. Bruex alleged that Woodside Management did not pay the Promissory Notes in full when it deducted $102,940 for certain fees and expenses from the final payment. The Bruex Parties claimed that Woodside Management's refusal to pay the remainder

due was a breach of the Promissory Notes. Mr. Bruex alleged there was $138,418 outstanding on the Notes. This amount was derived from the $102,940 setoff, plus interest. In Interrogatory Nos. 3 and 4, the jury was asked to decide whether Woodside Management breached the Promissory Notes by not paying the full amount due and, if so, what amount was due under the Promissory Notes.

{¶117} In Verdict Form No. 2, the jury found in favor of Woodside Management on Mr. Bruex's claim for breach of the Promissory Notes and indicated the "Amount due: $ -0-." Interrogatory Nos. 3 and 4 were specifically directed toward Verdict Form No. 2. These two interrogatories asked the jury the following questions:

Jury Interrogatory No. 3

Do you find that Woodside Management breached the Promissory Notes by not paying the full amount due on the Promissory Notes?

Six jurors circled "No" and two jurors circled "Yes."

Jury Interrogatory No. 4

If you found that Woodside Management breached the Promissory Notes, what is the amount you find to be due under the Promissory Notes?

* * *

Amount due on Promissory Notes: - 0 –
*(this amount must also appear in Verdict Form No. 2)*

(Emphasis in original.)

{¶118} Interrogatory No. 3 instructed the jurors to sign Verdict Form No. 2 and mark the appropriate box based upon their answer to that interrogatory. Interrogatory No. 4 indicated that the amount listed in that interrogatory for the amount due on the Promissory Notes must also

appear on Verdict Form No. 2. Verdict Form No. 2 had language instructing the jurors to insert the amount from Interrogatory No. 5[5] on the line for amount due.

**Arguments**

{¶119} The Woodside Parties argue that the claims for breach related to the Stock Purchase Agreement and the Promissory Notes are "'separate and distinct'" claims being brought by different parties and thus there are separate verdicts and interrogatories for each claim. In furtherance of this point, they assert that the interrogatories for one verdict cannot be used to decide a different verdict. Namely, the Woodside Parties assert that Interrogatory Nos. 1 and 2 set forth the basis for Verdict Form No. 1 regarding their breach of the Stock Purchase Agreement claim, while Interrogatory Nos. 3 and 4 form the basis for Verdict Form No. 2 regarding Mr. Bruex's breach of the Promissory Notes claim. Thus, they oppose the Bruex Parties' position that Interrogatory No. 2 can be used to decide Verdict Form No. 2.

{¶120} Despite the fact that Verdict Form No. 1/Interrogatory Nos. 1 and 2 and Verdict Form No. 2/Interrogatory Nos. 3 and 4 pertain to different claims, by different parties, the Bruex Parties suggest that Interrogatory No. 2 is directly related to Verdict Form No. 2 and thereby, Verdict Form No. 2 is dependent upon Interrogatory No. 2. Stated differently, the Bruex Parties contend that the answer to Interrogatory No. 2 decides the issues in Verdict Form No. 2. Operating under this premise, the Bruex Parties argue that the $48,940 setoff from the Promissory Notes listed in Interrogatory No. 2 is inconsistent with Verdict Form No. 2 finding no breach of the Promissory Notes and no monies due under the Notes.

---

[5] The reference to Interrogatory No. 5 appears to be a typographical error. We, however, decline to address whether that typographical error created an inconsistency because that was not the basis for the Bruex Parties' objection to the trial court regarding the inconsistency between the interrogatory answer and the verdict.

{¶121} While we agree the claims for breach of the Stock Purchase Agreement and the Promissory Notes are separate claims by different parties, there is a relationship between the claims due to the contractual provisions regarding setoff contained in each contract. The Stock Purchase Agreement allowed Woodside Management to set off its damages arising from a breach of the environmental warranty from the amount due on the Promissory Notes. Similarly, the Promissory Notes provided that Woodside Management had the right to withhold and set off its damages incurred under the Stock Purchase Agreement against any amount due under the Promissory Notes. In this matter, Interrogatory No. 2 tested the correctness of both Verdict Form No. 1 and No. 2.

{¶122} The Bruex Parties' position[6] that there is an inconsistency between Interrogatory No. 2 and Verdict Form No. 2 is premised entirely upon the word "justified" in Interrogatory No. 2. The Bruex Parties note that the "justified" $48,940 setoff amount listed in Interrogatory No. 2 was less than the actual amount of $102,940 set off by Woodside Management. Thus, the Bruex Parties contend that the remaining $74,000[7] reflected the amount Woodside Management was "not 'justified'" in setting off. And because this $74,000 was "not 'justified'" as a setoff, Woodside Management breached the Promissory Notes and $74,000 was due under the Promissory Notes. In simplified terms, the Bruex Parties told the trial court that "[b]y saying setoff of [$]48,000 the jury was finding that we did prove [the breach of the Promissory Notes claim]." They furthered this position in their appellee brief by stating, "The question * * * was whether [Woodside

_____

[6] While this is the Woodside Parties' assignment of error, the Bruex Parties were the parties challenging the general verdict. Thus, the Bruex Parties had the burden of demonstrating that the answer to the interrogatory was inconsistent and irreconcilable with the general verdict. *See Becker*, 17 Ohio St.3d at 162-163.

[7] We recognize there is a mathematical discrepancy in these figures and acknowledge that the Woodside Parties have challenged these figures in this assignment of error. Based upon our resolution of this assignment of error on other grounds, the discrepancy is moot. While we will continue to use the figures contained in the parties' briefs, it is in no way a reflection of the legal correctness of those figures.

Management] had breached the notes by failing, *without justification*, to pay the total due under them." (Emphasis added.)

{¶123} The Bruex Parties' reliance on the words "justified" and "without justification" to support the existence of an inconsistency between the interrogatory answer and the verdict is contrary to the record. On the fifth day of trial, the trial court reviewed the parties' proposed jury instructions that were filed prior to trial. The Woodside Parties submitted two jury instructions regarding the breach of the Promissory Notes claim. Their proposed jury instruction number 17 addressed liability and stated as follows:

> Mr. Bruex claims that Woodside Management breached the Promissory Notes by failing, *without justification*, to pay the full amount of the Notes.

> Before you can find for Mr. Bruex, Mr. Bruex must establish by the greater weight of the evidence that Woodside Management breached the Promissory Notes by failing, *without justification*, to pay the full amount of the Notes.

> * * *

(Emphasis added.) The Woodside Parties' proposed jury instruction number 18 addressed damages under the Promissory Notes claim:

> If you find by the greater weight of the evidence that Woodside Management breached the Promissory Notes by not paying the full amount of the Notes when it made certain deductions from its final payment on the Notes, Mr. Bruex is entitled to damages in the amount sufficient to place him in the same position [he] would have been if the contract had been fully performed by Woodside Management – in this instance, *the amount you determine to be still owed under the Notes* and not properly deducted by Woodside Management.

(Emphasis added.)

{¶124} The Bruex Parties objected to the phrase "without justification" in the Woodside Parties' proposed jury instruction 17, saying it was "unnecessary here" and that they preferred to have their instruction instead. As to the Woodside Parties' proposed jury instruction 18, they challenged the phrase "the amount you determine to be still owed under the Notes" and again

indicated that they "would prefer [their] instruction." Notably, the Bruex Parties did not specifically reference the "not properly deducted" phrase in the proposed instruction 18. Nonetheless, the Bruex Parties did not want to use any part of the Woodside Parties' proposed jury instruction 18.

{¶125} There was also some discussion about setoff. The Woodside Parties had not provided an instruction in that regard, and the Bruex Parties indicated that if one were to be provided then "maybe" they would not object to the proposed instructions 17 and 18. The Woodside Parties did not provide a proposed setoff instruction prior to the end of the trial, and thus no setoff instruction was given to the jury.

{¶126} The jury instruction given with regard to the Promissory Notes claim mirrored the Bruex Parties' proposed instruction:

> As a result of the stock purchase agreement, Woodside Management issued two promissory notes to Andrew Bruex for the sale of the stock of Woodside Management. Mr. Bruex claims that Woodside Management breached one of those notes by not paying them fully, thereby causing him damage.
>
> As previously noted, a contract is breached when one party fails or refuses to perform it[s] duties under the contract.
>
> Before you can find for Mr. Bruex, you must find by a preponderance of [the] evidence that Woodside Management failed to pay the amounts due under them, and determine the amount due thereunder from the evidence produced at trial.
>
> If you find that Mr. Bruex has proven his claim by the greater weight of the evidence, then you should find in favor of Mr. Bruex, and then determine what damages should be awarded. If, on the other hand, you find that Mr. Bruex failed to prove any part of his claim, then you must find for Woodside Management.

In accordance with the Bruex Parties' objections and request, there was no reference to "without justification" in this instruction. Thus, the jury was not instructed to decide "the question, * * * [of] whether [Woodside Management] had breached the note by failing, without justification, to pay the total due under them."

{¶127} Moreover, Interrogatory No. 3, which addressed the liability issue in the breach of the Promissory Notes claim, contained no reference to failing to pay "without justification." Rather, Interrogatory No. 3 asked if "Woodside Management breached the Promissory Notes by not paying the full amount due on the Promissory Notes[.]" There were no objections to this Interrogatory.

{¶128} In light of the jury instructions and Interrogatory No. 3, and in conjunction with the Bruex Parties' objections to the Woodside Parties' proposed jury instructions containing justification language, the Bruex Parties cannot change their theory and now argue that the breach of the Promissory Notes occurred by "failing, without justification, to pay the total due under them." *See PPG Industries, Inc. v. Heritage Fireplace Equip., Co.*, 9th Dist. Summit No. 11695, 1985 WL 10640, *5 (Mar. 27, 1985), citing *Republic Steel Corp. v. Bd. of Rev. of Cuyahoga Cty.*, 175 Ohio St. 179, 184-185 (1963). Because the Bruex Parties' theory of the case and the jury instructions did not include justification, they cannot now rely upon the use of the "justified" setoff finding in Interrogatory No. 2 to argue there was an inconsistency with Verdict Form No. 2.

{¶129} The Bruex Parties' objective in arguing that Interrogatory No. 2 and Verdict Form No. 2 were inconsistent was to obtain a judgment for the portion of the setoff that the jury did not award to Woodside Management. The Bruex Parties' rationale was that if Woodside Management was "justified" in setting off only $48,940, then Mr. Bruex as a matter of course must be awarded the difference under the claim for breach of the Promissory Notes. At first glance, the Bruex Parties' argument seems plausible. However, a review of the jury instructions and Interrogatory No. 3 reflects that the liability and damage issues in the breach of the Promissory Notes claim were not presented to the jury in that framework.

{¶130} Relative to the breach of the Promissory Notes, the jury was asked if "Woodside Management breached the Promissory Notes by not paying the full amount due on the Promissory Notes" and if so, the amount due under the Notes. As addressed above, answering these questions does not involve any consideration of whether the non-payment was with or without justification. Instead, the issue is the scope of the breach described in the jury instructions and in Interrogatory No. 3. The breach was described in the jury instructions as "not paying them fully" and in Interrogatory No. 3 as "not paying the full amount due." Mr. Bruex testified that the "full amount * * * due under the promissory note" was $138,418. This figure comprised the entire amount Woodside Management set off, $102,940, plus interest. Based upon the language in Interrogatory No. 3 and the jury instructions, the scope of the breach was limited to not paying $138,418 due on the Promissory Notes. The Bruex Parties' trial tactic was to base the breach upon the failure to pay the full amount due, rather than a failure to pay a partial amount due.[8]

{¶131} By virtue of the jury's answer in Interrogatory No. 2 that allowed Woodside Management to set off $48,940 from the Promissory Notes, Woodside Management did not breach the Promissory Notes "by not paying the full amount due," which was $138,418. Accordingly, this view of the case reconciles Interrogatory No. 2 with Verdict Form No. 2. *See Cromer*, 2017-Ohio-7846, at ¶ 9. *See also Ragone,* 121 Ohio App.3d at 370 ("If possible, the reviewing court must adopt a view of the case that resolves any seeming inconsistency."). Albeit for different reasons,[9] we agree with the Woodside Parties that it was "entirely possible and consistent for the

---

[8] The language proposed in jury instruction number 18 by the Woodside Parties ("the amount you determine to be still owed under the Notes and not properly deducted by Woodside Management") allowed for a breach of the Promissory Notes on a partial amount. But the Bruex Parties objected to the proposed jury instruction, "prefer[ring their] instruction."

[9] Based upon our resolution of this assignment of error in favor of the Woodside Parties, we decline to address the Woodside Parties' arguments regarding an alternative interpretation based upon good faith setoff.

jury to determine that Woodside Management's set-off should have been $48,940.00 while still finding that Woodside Management did not breach the Notes."

**{¶132}** Based upon the foregoing, we conclude that the trial court abused its discretion when it determined that Interrogatory No. 2 was inconsistent and irreconcilable with Verdict Form No. 2. Because Interrogatory No. 2 was consistent with Verdict Form No. 2, it was incumbent upon the trial court to give effect to the jury's verdict and award by granting judgment in favor of Woodside Management on the breach of the Promissory Notes claim.

**{¶133}** The Woodside Parties' seventh assignment of error is sustained.

### THE BRUEX PARTIES' ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT AWARDED [MR.] BRUEX INADEQUATE DAMAGES ON HIS CLAIM AGAINST WOODSIDE MANAGEMENT FOR BREACH OF THE PROMISSORY NOTES.

**{¶134}** The Bruex Parties contend that the $74,000 damages award on the breach of the Promissory Notes claim is inadequate and instead Mr. Bruex should have been awarded damages in the amount of $102,940. The Bruex Parties do not present any merit arguments in support of this assignment of error. Instead, they contend that should this Court sustain their first assignment of error regarding the denial of the motion for directed verdict on the breach of the Stock Purchase Agreement, then this Court must likewise sustain their third assignment of error. In light of our disposition overruling the Bruex Parties' first assignment of error and sustaining the Woodside Parties' seventh assignment of error, the Bruex Parties' third assignment of error is overruled.

### THE BRUEX PARTIES' ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT INCORRECTLY AWARDED ATTORNEY FEES AND EXPENSES TO PLAINTIFFS.

{¶135} The Bruex Parties contend that the trial court erred in awarding attorney fees and expenses to the Woodside Parties on their breach of the Stock Purchase Agreement claim. We disagree.

{¶136} Generally, attorney fees are not recoverable in contract claims. *See Allen v. Standard Oil Co.*, 2 Ohio St.3d 122, 125 (1982), citing *Gates v. Toledo*, 57 Ohio St. 105 (1897). This principle comports with the American Rule, which provides that each party in a lawsuit pays their own attorney fees. *See Wilborn v. Bank One Corp.,* 121 Ohio St.3d 546, 2009-Ohio-306, ¶ 7. There are three exceptions to the American Rule that permit recovery of attorney fees: 1) a statute creates a duty to pay fees; 2) the parties contract to shift fees; or 3) the losing party acted in bad faith. *Id.*

{¶137} The decision whether to award attorney fees and how much rests within the trial court's discretion. *Motorists Mut. Ins. Co. v. Brandenburg*, 72 Ohio St.3d 157 (1995), syllabus; *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991). However, the issue of whether a statute or contract provides for an award of attorney fees requires interpretation of the statute or contract, which is reviewed de novo. *See Nixon v. Quality Mold, Inc.*, 9th Dist. Summit No. 25400, 2011-Ohio-1658, ¶ 15 (statute); *Fabrication Group LLC v. Willowick Partners LLC*, 11th Dist. Lake No. 2011-L-141, 2012-Ohio-4460, ¶ 37 (contract). Similarly, the determination that a party is the prevailing party in a contract that permits the recovery of attorney fees is reviewed de novo. *Gauthier v. Gauthier*, 12th Dist. Warren Nos. CA2018-09-098, CA2018-09-099, 2019-Ohio-4208, ¶ 63.

{¶138} The Bruex Parties present three alternative questions of law related to the Woodside Parties' right to obtain attorney fees relative to the claim for breach of the Stock Purchase Agreement. We address each argument in turn.

**R.C. 2721.16**

{¶139} The Bruex Parties first argue that R.C. 2721.16 does not provide a statutory right to the Woodside Parties to recover attorney fees for the breach of the Stock Purchase Agreement. We review de novo whether R.C. 2721.16 creates a statutory right to attorney fees in this matter. *See Nixon* at ¶ 15.

{¶140} R.C. 2721.16(A) permits recovery of attorney fees in an action for declaratory relief in the following instances:  1) a statute expressly authorizes an award of attorney fees in a declaratory judgment action, 2) attorney fees are authorized by either R.C. 2323.51 or by a punitive damages award, or 3) in actions involving fiduciaries.  We agree with the Bruex Parties that none of the exceptions in R.C. 2721.16(A) are present in this case and that R.C. 2721.16 does not create a statutory right to attorney fees in this matter.  Our determination, however, is superfluous because the Woodside Parties did not seek attorney fees as to the declaratory judgment claim in Count 1 of the amended complaint.  Rather, they sought attorney fees in Count 2, the breach of the Stock Purchase Agreement.

**Stock Purchase Agreement, Sections 8.1(a) and 8.3**

{¶141} A stock purchase agreement is a contract and is subject to interpretation using traditional contract principles.  *See ASA Architects, Inc.*, 75 Ohio St.3d at 673; *Rongone,* 1991 WL 35101, at *2.  The interpretation of a contract is a matter of law.  *St. Marys*, 115 Ohio St.3d 387, 2007-Ohio-5026, at ¶ 38.  Whether a fee-shifting provision in a contract allows for recovery of attorney fees is reviewed de novo.  *See Fabrication Group LLC*, 2012-Ohio-4460, at ¶ 37

{¶142} In this matter, the Stock Purchase Agreement did not contain a separate attorney fees provision.   Rather, Article 8, Indemnification and Limitations, sets forth various indemnification matters, including Mr. Bruex's indemnification of Woodside Management for its

attorney fees. An express agreement to indemnify another for legal fees is generally enforceable. *See Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238 (1987), syllabus. "Contract provisions which provide indemnification for attorney fees are subject to the ordinary rules of contract construction." *Continental Tire N. Am. v. Titan Tire*, 6th Dist. Williams No. WM-09-010, 2010-Ohio-1355, ¶ 47. *See Rayco Mfg., Inc. v. Beard Equip. Co.*, 9th Dist. Wayne No. 11CA0057, 2014-Ohio-970, ¶ 22. When determining whether an indemnification agreement provides for the indemnification of attorney fees, the court must examine the language used in the agreement. *Worth* at 240.

{¶143} Section 8.1(a) sets forth the parameters of Mr. Bruex's indemnification duties to Woodside Management as follows:

> [**Mr. Bruex] shall indemnify [Woodside Management]** * * * **against** any and all losses, claims, liabilities, damages, charges and litigation, **and all expenses of enforcement, recovery or remedy** of any of the foregoing, **including without limitation, reasonable attorneys' fees** (collectively, "Claims") **suffered or incurred by [Woodside Management] as a result of a breach of any** covenant, **warranty, representation** or obligation **by [Mr. Bruex] contained in this Agreement**, including, without limitation, Claims by [Woodside Management] against [Mr. Bruex] for damages suffered and expenses incurred as a result of a breach of this Agreement by any of them or in enforcing the obligations hereunder.

(Emphasis and alterations added.) The Bruex Parties contend that the circumstances in this case do not permit recovery of attorney fees under Section 8.1(a). Specifically, they argue that any attorney fees incurred by the Woodside Parties were not proper "expenses of enforcement, recovery or remedy" because the Woodside Parties had already exercised their right to self-help by offsetting their damages under the Promissory Notes.

{¶144} This argument fails to consider all of the indemnification provisions in Article 8 as a whole and to give effect to each part of Article 8. *See Saunders*, 101 Ohio St.3d 86, 2004-Ohio-

24, at ¶ 16. Contrary to the Bruex Parties' position, Section 8.3, Right of Setoff, permitted Woodside Management to pursue setoff and to file a complaint in court:

> Upon notice to [Mr. Bruex] specifying in reasonable detail the basis therefor, [Woodside Management] may set off any amount to which it may be entitled under this Section 9 *[sic]* against amounts otherwise payable under the Promissory Note. * * * Neither the exercise of nor the failure to exercise such right of setoff or to give a notice of a claim hereunder will constitute an election of remedies or limit [Woodside Management] in any manner in the enforcement of any other remedies that may be available to it.

Accordingly, Woodside Management's exercise of its right of setoff in Section 8.3, did not preclude its right to indemnification of attorney fees under Section 8.1(a).

{¶145} Based upon the plain language of Section 8.1(a) of the Stock Purchase Agreement, we conclude that this indemnification provision permitted Woodside Management to recover its attorney fees as expenses incurred in the enforcement, recovery, and remedy of Mr. Bruex's breach of the environmental warranty and representation in Count 2 of the amended complaint.

**Prevailing Party**

{¶146} This Court has recognized that "[a] prevailing party is generally the party ""in whose favor the decision or verdict is rendered and judgment entered.""""[10] *Moga v. Crawford*, 9th Dist. Summit No. 23965, 2008-Ohio-2155, ¶ 6, quoting *Hagemeyer v. Sadowski*, 86 Ohio App.3d 563, 566 (6th Dist.1993), quoting *Yetzer v. Henderson,* 5th Dist. Richland No. CA-1967, 1981 WL 6293, *2 (June 4, 1981). "One's status as a prevailing party 'does not depend upon the

---

[10] We recognize that the definition of prevailing party in these cases was applied to awards of costs and attorney fees pursuant to an earlier version of Civ.R. 54(E), and not to awards of attorney fees pursuant to a contractual fee-shifting provision. However, this definition of prevailing party has been applied in instances where attorney fees were statutorily or contractually allowed. *See Ulrich v. Mercedes-Benz USA, L.L.C.*, 187 Ohio App.3d 154, 2010-Ohio-348, ¶ 30, 32 (9th Dist.) (statute); *Gauthier*, 2019-Ohio-4208, at ¶ 19, 62-65 (contract); *L.G. Harris Family Ltd. Partnership I v. 905 S. Main St. Englewood, LLC*, 2d Dist. Montgomery No. 26682, 2016-Ohio-7242, ¶ 38, 43-45 (contract).

degree of success at different stages of the suit, but on whether, *at the end of the suit, * * * the party who had made a claim against the other, has successfully maintained it.*'" (Emphasis sic.) *Ulrich* at ¶ 32, quoting *Moga* at ¶ 6. "[A] party who received a jury verdict in his favor and was awarded damages, no matter how small, has prevailed in the suit." *Haynes v. Christian*, 9th Dist. Summit No. 24556, 2009-Ohio-3973, ¶ 6. *See Hustler Cincinnati, Inc. v. Elm 411, LLC*, 1st Dist. Hamilton No. C-130754, 2014-Ohio-5648, ¶ 15 ("[A] party may be a prevailing party for fee-shifting purposes even if he obtains only some of the relief originally sought."). We review the trial court's determination that the Woodside Parties were the prevailing party de novo. *See Gauthier* at ¶ 63.

{¶147} In their amended complaint, the Woodside Parties alleged a claim for breach of the Stock Purchase Agreement and sought a judgment for all of their damages in an amount in excess of $100,00, plus attorney fees. The jury returned a verdict in favor of Woodside Management and found that it was entitled to set off damages in the amount of $48,940. While this was not the full setoff amount ($102,940) that Woodside Management sought, it nonetheless was successful on its claim for breach of the Stock Purchase Agreement. *See Haynes* at ¶ 6.

{¶148} The Bruex Parties' contention that Woodside Management was not the prevailing party because the trial court entered a judgment in favor of Mr. Bruex in the amount of $74,000 for the Promissory Notes is not well-taken in light of our disposition of the Woodside Parties' seventh assignment of error. Accordingly, the trial court did not err in determining that the Woodside Parties were the prevailing party.

**Conclusion**

{¶149} Upon consideration of the Bruex Parties' three arguments, they have failed to demonstrate that the Woodside Parties were not entitled to recover attorney fees under the fee-

shifting provision of the Stock Purchase Agreement. Thus, the trial court did not err when it awarded attorney fees to Woodside Management on the breach of the Stock Purchase Agreement. The Bruex Parties' second assignment of error is overruled.

### THE BRUEX PARTIES' ASSIGNMENT OF ERROR NO. 5

THE TRIAL COURT INCORRECTLY FAILED TO AWARD MR. BRUEX ATTORNEY FEES ON HIS BREACH OF PROMISSORY NOTES CLAIM.

{¶150} The Bruex Parties argue that the trial court erred when it denied Mr. Bruex attorney fees on his breach of the Promissory Notes claim. We disagree.

{¶151} A promissory note is a contract and is subject to interpretation pursuant to contract rules. *PHH Mtge. Corp. v. Ramsey*, 10th Dist. Franklin Nos. 13AP-925, 14AP-129, 2014-Ohio-3519, ¶ 33. The interpretation of a contract is a matter of law. *St. Marys*, 115 Ohio St.3d 387, 2007-Ohio-5026, at ¶ 38. The Promissory Notes in this matter contained an attorney fee provision. Whether a party is entitled to attorney fees based upon a contract provision in a promissory note is reviewed de novo. *See Harvest Land Co-Op, Inc. v. Hora*, 2d Dist. Montgomery No. 25068, 2012-Ohio-5915, ¶ 79.

{¶152} The Promissory Notes provided for the recovery of attorney fees as follows:

Upon the occurrence of any Event of Default, [Woodside Management] shall pay to [Mr. Bruex] all reasonable attorneys' fees, court costs and expenses incurred by [Mr. Bruex] in connection with [Mr. Bruex's] efforts to collect the indebtedness evidenced hereby, and [Mr. Bruex] may exercise from time to time any of the rights and remedies available to [Mr. Bruex] under the applicable law.

The Promissory Notes defined three "Events of Default." Only the first event is relevant to this matter: "[Woodside Management] fail[ed] to pay any installment of principal, interest, or any other sum payable in accordance with this Note when due[.]" Additionally, the Promissory Notes allowed for setoff against the balance: "[Woodside Management] shall have the right to withhold and set off against any amount due hereunder the amount of any claim for indemnification or

payment of damages to which [Woodside Management] may be entitled under the [Stock Purchase Agreement]."[11]

{¶153} The Bruex Parties argue that the trial court "incorrectly determined that [the Woodside Parties'] failure to pay $74,000 of the amount due under the promissory notes while, at the same time, claiming to have paid them off in full was not an 'Event of Default' within the meaning of those notes." To the extent the Bruex Parties rely upon the jury's clarification interrogatory and the subsequent $74,000 judgment rendered by the trial court, we will not consider such arguments due to our disposition of the Woodside Parties' seventh assignment of error. As to the Bruex Parties' general argument that the trial court wrongly decided that there was no "Event of Default," this argument is fundamentally flawed because it ignores the jury's verdict and interrogatory regarding the breach of the Promissory Notes claim.

{¶154} With regard to Mr. Bruex's claim for breach of the Promissory Notes, the jury rendered a verdict against him and in favor of Woodside Management and awarded no money to Mr. Bruex. The jury was asked in Interrogatory No. 3, "Do you find that Woodside Management breached the Promissory Notes by not paying the full amount due on the Promissory Notes?" to which six jurors answered "No."

{¶155} In their Reply Brief, the Bruex Parties set forth their position as to what constituted the "Event of Default" in this matter: "[The Woodside Parties'] failure to pay the full amount due

---

[11] The Woodside Parties argue that the setoff was done in good faith and thus was not an "Event of Default" pursuant to Section 8.3 of the Stock Purchase Agreement ("The exercise of such right of setoff by [Woodside Management] in good faith, whether or not ultimately determined to be justified, will not constitute an event of default under the Promissory Note."). The Bruex Parties oppose this argument on the basis that there was no evidence that Woodside Management acted in good faith, and the jury was not asked, nor did it determine that Woodside Management acted in good faith. These arguments are not relevant in light of our discussion below regarding the jury's answer to Interrogatory No. 3.

under the promissory notes was an 'Event of Default' as that term is defined in the promissory notes." This is the same issue the jury answered in Interrogatory No. 3. While the jury was not asked explicitly in an interrogatory if there was an "Event of Default," by virtue of their answer to Interrogatory No. 3 and Verdict Form No. 2, the jury implicitly found there was no "Event of Default."

{¶156} The trial court determined there was no "'Event of Default'" under the Promissory Notes based upon the fact that the Woodside Parties "prevailed" on the breach of the Promissory Notes counterclaim. The trial court also referenced the jury's findings as to the setoff amounts: "the jury found [the Woodside Parties] were entitled to set off the amount of $48,940.00 of the promissory notes, and the remaining $74,000.00 was due and owing to [the Bruex Parties]." In light of our disposition of the Woodside Parties' seventh assignment of error, the trial court's reference to the jury's findings regarding the $74,000 remaining due was an improper consideration. Nonetheless, the trial court reached the correct conclusion that there was no "Event of Default" based upon the fact that the Woodside Parties prevailed on the breach of the Promissory Notes claim. Verdict Form No. 2 and Interrogatory No. 3 support this conclusion. Accordingly, the trial court correctly determined that Mr. Bruex was not entitled to attorney fees pursuant to the fee-shifting provision in the Promissory Notes.

{¶157} The Bruex Parties' fifth assignment of error is overruled.

### THE WOODSIDE PARTIES' ASSIGNMENT OF ERROR NO. 9

THE TRIAL COURT ERRED IN FAILING TO SPECIFY WHICH PARTIES WERE AWARDED FEES AND WHICH PARTIES THE FEE AWARDS WERE RENDERED AGAINST IN ITS FEBRUARY 26, 2018 ATTORNEY'S FEE DECISION.

{¶158} The Woodside Parties contend that the trial court's February 26, 2018 order awarding attorney fees was unclear because of the use of the terms plaintiffs and defendants to

identify the parties. While the February 26, 2018 order was inartfully drafted, the order is not unclear.

{¶159} To the extent that the February 26, 2018 order addressed attorney fees regarding the breach of the Stock Purchase Agreement and the breach of the Promissory Notes, we overrule the Woodside Parties' ninth assignment of error. With regard to the attorney fees award on the breach of the Lease in the February 26, 2018 order, we decline to address the Woodside Parties' ninth assignment of error as being premature due to our resolution of the Woodside Parties' first assignment of error.

III.

{¶160} The Bruex Parties' first, second, third, and fifth assignments of error are overruled and their fourth assignment of error is premature  As to the Woodside Parties' cross-appeal, their first and seventh assignments of error are sustained, while their ninth assignment of error is overruled in part and premature in part. The Woodside Parties' eighth assignment of error is moot. The Woodside Parties' second, third, fourth, fifth, and sixth assignments of error are premature. The judgment of the Summit County Court of Common Pleas is affirmed in part and reversed in part, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

CLAIR E. DICKINSON, KERRI KELLER, and JOSEPH T. DATTILO, Attorneys at Law, for Appellants/Cross-Appellees.

PHILIP F. DOWNEY and ANDREW P. GURAN, Attorneys at Law, for Appellees/Cross-Appellants.