[Cite as *Schultete v. Steinke*, 2024-Ohio-1538.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

MICHAEL P. SCHULTE, IN HIS
CAPACITY AS ADMINISTRATOR
OF THE ESTATE OF NICOLE S.
SCHULTE, DECEASED,

    PLAINTIFF-APPELLANT.

  v.

FRANK L. STEINKE, ET AL.,

    DEFENDANTS-APPELLEES.

CASE NO. 1-23-52

**O P I N I O N**

Appeal from Allen County Common Pleas Court
Civil Division
Trial Court No. CV 2021 0067

**Judgment Affirmed**

**Date of Decision:  April 22, 2024**

**APPEARANCES:**

    *Thomas J. O'Connell & Lawrence D. Abramson* **for Appellant**

    *Dalton J. Smith* **for Appellees**

**WILLAMOWSKI, P.J.**

{¶1} Plaintiff-appellant Micheal P. Schulte, Administrator of the Estate of Nicole S. Schulte ("Appellant") brings this appeal from the judgment of the Court of Common Pleas of Allen County granting summary judgment to defendants-appellants Meyer's Tavern, Beer Inc., Robert A. Meyer, and Josh A. Meyer ("Appellees"). Appellant claims on appeal that the trial court erred in granting summary judgment as there are material issues of fact. For the reasons set forth below, the judgment is affirmed.

{¶2} On March 11, 2020, at approximately 8:20 p.m., Nicole S. Schulte ("Nicole") was driving home from work on State Route 501 in Allen County, Ohio. A truck operated by Frank Steinke ("Steinke") crossed the centerline and struck Nicole's vehicle head-on. Emergency personnel responded to the accident and Nicole was pronounced dead at the scene. Sergeant Robert Kohli ("Kohli") noted that Steinke had an odor of an alcoholic beverage about his person along with watery eyes and slow, slurred speech. Kohli also noted that Steinke appeared unsteady on his feet, disoriented, and confused. Two cans of Coors Light beer were found in Steinke's truck and Kohli suspected that Steinke was intoxicated.

{¶3} Steinke was taken from the scene to St. Rita's Medical Center. The emergency room doctor described Steinke as clearly intoxicated with slurred speech

that is incomprehensible at times with a strong odor of an alcoholic beverage on his person. Steinke was unable to give a coherent, reliable description of what happened that evening. Steinke admitted to consuming two beers, but did not admit to drinking anything else at the time. Approximately one hour after the accident, medical personnel drew blood from Steinke to determine his blood alcohol content level ("BAC"). The result showed a BAC of .27. A second draw was completed approximately an hour and a half later and showed a BAC of .211.

{¶4} On March 3, 2021, Appellant filed a complaint against Appellees. The complaint alleged that Appellees were negligent and the negligence caused personal injuries to Nicole as well as her death. The basis for the claim against Appellees, was that appellees sold intoxicating beverages to a noticeable intoxicated person (Steinke) in violation of R.C. 4399.18. Appellees filed their answer on March 18, 2021 and denied the allegations in the complaint. An extensive period of discovery followed.

{¶5} On May 31, 2022, Appellant filed a motion for summary judgment against Steinke, but the motion did not include Appellees. That same day Appellees filed a motion for summary judgment alleging that Appellant had failed to present evidence that Appellees had sold any alcohol to Steinke on March 11, 2020. Numerous depositions were filed with the trial court. On June 28, 2022, Appellant filed a memorandum in opposition to Appellees' motion for summary judgment.

Appellees filed their response on November 28, 2022. On June 5, 2023, the trial court entered judgment granting Appellees' motion for summary judgment. Appellant filed a notice of appeal from this judgment. On appeal, Appellant raises the following assignments of error.

### First Assignment of Error

**The trial court erred in finding that there is no genuine issue of material fact as to whether an employee of [Meyer's] Tavern sold intoxicating beverages to Frank Steinke on March 11, 2020.**

### Second Assignment of Error

**The trial court erred in finding that there is no genuine issue of material fact as to whether an employee of [Meyer's] Tavern knowingly sold intoxicating beverages to Frank Steinke while he was noticeably intoxicated.**

### Third Assignment of Error

**The trial court erred by entering a summary judgment that is inconsistent with its ruling one day earlier that [sic] Appellant is entitled to additional discovery.**

### Fourth Assignment of Error

**The trial court erred in failing to allow Appellant additional time to complete discovery and respond to the summary judgment motion.**

### Fifth Assignment of Error

**The trial court erred in denying Appellant's motion to compel a forensic inspection of cell phones and a personnel file when such discovery requests were relevant to Appellant's dram shop claim.**

*Summary Judgment*

**{¶6}** In the first and second assignments of error, Appellant claims that the

trial court erred in granting Appellees motion for summary judgment.

> An appellate court reviews a trial court's summary judgment decision
> de novo, independently and without deference to the trial court's
> decision. * * * Summary judgment is appropriate only "when the
> requirements of Civ.R. 56(C) are met." * * * The party moving for
> summary judgment must establish: (1) that there are no genuine issues
> of material fact; (2) that the moving party is entitled to judgment as a
> matter of law; and (3) that reasonable minds can come to but one
> conclusion and that conclusion is adverse to the nonmoving party, said
> party being entitled to have the evidence construed most strongly in
> his favor. * * * In ruling on a motion for summary judgment, a court
> may not "weigh evidence or choose among reasonable inferences * *
> *." * * * Rather, the court must consider the above standard while
> construing all evidence in favor of the non-movant. * * *
>
> The party moving for summary judgment must identify the basis of
> the motion to allow the non-movant a "meaningful opportunity to
> respond." * * * In its motion, the moving party "must state
> specifically which areas of the opponent's claim raise no genuine
> issue of material fact and such assertion may be supported by
> affidavits or otherwise as allowed by Civ.R. 56(C)." * * * If the
> moving party fails to meet its burden, summary judgment is
> inappropriate; however, if the moving party meets its initial burden,
> the non-moving party has a "reciprocal burden outlined in Civ.R.
> 56(E) to set forth specific facts showing that there is a genuine issue
> for trial * * *."

(Citations omitted). *Lillie v. Meachem*, 3d Dist. Allen No. 1-09-09, 2009-Ohio-

4934, ¶21-22. As the standard of review is de novo, we will review whether there

are any genuine issues of material fact, whether Appellees are entitled to judgment

as a matter of law and whether reasonable minds could reach a verdict in favor of Appellant upon the claims set forth in the complaint.

{¶7} The complaint in this case alleges that appellees are liable for the injuries and wrongful death of Nicole because they allegedly served alcoholic beverages to Steinke in the hours before the collision with Nicole. The complaint further alleges that the alcoholic beverages were sold to Steinke despite the server's knowledge that Steinke was intoxicated. The basis for the case against Appellees is legislation commonly known as The Dram Shop statute, which provides in pertinent part as follows.

> A person has a cause of action against a permit holder or an employee of a permit holder for personal injury, death, or property damage caused by the negligent actions of an intoxicated person occurring off the premises or away from a parking lot under the permit holder's control only when both of the following can be shown by a preponderance of the evidence:
>
> (A) The permit holder or an employee of the permit holder knowingly sold an intoxicating beverage to at least one of the following:
>
> (1) A noticeably intoxicated person in violation of division (B) of section 4301.22 of the Revised Code;
>
> * * *
>
> (B) The person's intoxication proximately caused the personal injury, death, or property damage.

R.C. 4399.18. In order to prevail on a claim under R.C. 4399.18 in a case like this, the plaintiff must show that 1) the permit holder knowingly sold an alcoholic

beverage to 2) a noticeably intoxicated person. This is the only cause of action against a liquor-permit holder for off-premise injuries caused by an intoxicated person. *Johnson v. Montgomery*, 151 Ohio St.3d 75, 2017-Ohio-7445, 86 N.E.3d 279. The failure to show either of these requirements negates the liability of the permit-holder. *Id.*

{¶8} Here, the first issue raised is whether Steinke went to Meyer's Tavern on March 11, 2020. Appellant testified in his deposition that he had no personal knowledge that Steinke had been drinking at Meyer's Tavern before the accident. However, Appellant testified that a few days after the accident, Zach Wilges ("Wilges") told him that Steinke had been drinking at Meyer's Tavern on the day of the accident and that people had offered to drive Steinke home. Appellant stated that the information had come from Joe Knueve ("Knueve").

{¶9} Wilges also gave a deposition. In Wilges' deposition, he stated that Appellant had misunderstood him. Wilges indicated that Knueve had told Wilges that Knueve had seen Steinke at Meyer's Tavern previously, but not on that night. Wilges denied ever telling Appellant that Steinke was present at Meyer's Tavern on March 11, 2020, but admitted that he had heard rumors that Steinke had been drinking at Meyer's Tavern on that night and had been offered rides home from people. Wilges admitted he had no personal knowledge of Steinke's location on

March 11, 2020 and did not provide any identification for the people who told him Steinke was at Meyer's Tavern that day.

{¶10} Josh Meyer ("Josh") testified in his deposition that he was the manager of Meyer's Tavern and was at the bar in the afternoon of March 11, 2020, which was a Wednesday. Josh had known Steinke for over a decade and indicated that Steinke came into Meyer's Tavern on Thursday evenings to participate in the drawings done at the bar. After the accident, Josh reviewed the camera footage of the bar for March 11 the next day and did not see Steinke in the bar. Josh did see Frank George ("George") on the videotape and indicated that George comes into the bar almost daily when he is in town. George usually comes to Meyer's Tavern around 12:30 or 1:00 pm and will run a tab almost every time. George's tab typically has the same items on it - low liquor, low Styrofoam, and Marlboro lights. A review of the records shows that a tab was run on March 11, 2020, and was labeled "Frank", which Josh believed belonged to George due to the time of day, the items purchased, and the fact that George was seen on the videotape. Josh also testified that he asked Cindy Koenig ("Koenig"), who served "Frank" if Steinke had been at Meyer's Tavern on March 11, 2020, and she told him no.

{¶11} Koenig testified in her deposition that she knew Steinke as he was a distant relation, but he only came to Meyer's Tavern "every once in a great while." Koenig was working at Meyer's Tavern on March 11, 2020, and was the server for

the person who ran the tab labeled "Frank". Koenig remembered talking about the accident the next day when Josh asked her if she knew about it. Koenig told Josh that it was a good thing that Steinke had not been at the bar beforehand. When asked if George was at the bar on March 11, 2020, Koenig was not sure, but assumed he must have been since there was a tab labeled "Frank" and it would only be either George or Steinke. Koenig based her assumption on the fact that she remembered that Steinke had not been there because the accident was a significant event that prompted her memory. Koenig also testified that when Steinke did come to Meyer's Tavern, he did not usually drink to the point of intoxication. According to Koenig, the rumors she heard were that Steinke had been drinking at Dawn Steinke's ("Dawn") home before the accident.

{¶12} Steinke testified in his deposition that he was at his own home until he left between 3:00 pm and 3:30 pm to go to Dawn's house, and arrived at her house around 4:00 pm. Steinke testified that he did not drink any alcohol before going to Dawn's house. Steinke took two cans of Coors Light with him and then drank two mixed drinks of Crown Royal and Diet Pepsi. According to Steinke, he was at Dawn's until after dark and the accident occurred while he was on his way home. When asked about going to Meyer's Tavern, Steinke testified that he rarely goes there, and only on Thursday's for the drawing. Steinke testified that he generally paid cash for his drinks and does not run a tab at Meyer's Tavern when he is there.

Steinke denied going to Meyer's Tavern on March 11, 2020, or that anyone from Meyer's Tavern gave him any alcohol on that day.

{¶13} Robert Meyer ("Robert") testified that he is the owner of Meyer's Tavern. Robert indicated that on March 11, 2020, he left Meyer's Tavern around 6 pm and had not seen Steinke in the bar that day. Robert indicated that he has known both Steinke and George for most of his life. According to Robert, Steinke would sometimes come to Meyer's Tavern on Thursday nights for the drawing, but George came almost every day. Although Robert does not specifically remember seeing George on March 11, 2020, Robert believed he was there because he usually was there when he was in town. Robert heard about the accident and wondered if Steinke had been at Meyer's Tavern before the accident. Robert asked Koenig if she had seen Steinke on March 11, 2020, and she denied he had been there. Robert then asked Josh to look at the cameras. When Josh told him that Steinke was not on the tape, Robert dropped the issue. Robert testified that Steinke does not ever run a tab, but instead pays for each single transaction as it arises, usually with cash. The receipt marked "Frank" was a tab with many orders run on it.

{¶14} George testified that he was in Botkins on March 11, 2020, but does not remember if he went to Meyer's Tavern that day. However, George testified that he would go to the bar regularly, usually by himself and in the afternoon. When there, he commonly runs a tab and pays the bill at the end of his visit. George

testified that he does not drink Coors Light or Bud Light, but sometimes will buy drinks for other people at the bar. The amount of the bill from March 11, 2020, was not uncommon for George to pay when he was at Meyer's Tavern. George indicated that he usually does not see Steinke at Meyer's Tavern because George goes in the afternoons and Steinke would go in the evenings. George had no knowledge of where Steinke was on March 11, 2020, but testified that he had heard Steinke was at Dawn's home before the accident.

{¶15} Dawn testified that on March 11, 2020, Steinke came to her house in the afternoon and left at some time after 7:30 pm. When Steinke arrived he brought three cans of beer and drank them at her house. After Steinke finished the beers, he made himself two glasses of Crown Royal mixed with coke. Dawn did not know where Steinke was before he arrived at her house, but testified that when he arrived he was speaking clearly. Dawn also indicated that Steinke did not have the smell of an alcoholic beverage about his person, his gait was normal and he was not slurring his speech when he arrived. Dawn testified that to her knowledge, Steinke was not a frequent customer of Meyer's Tavern. When Steinke left the house, he did not exhibit any behavior that would indicate he was intoxicated. No one had ever told her that Steinke was at Meyer's Tavern before coming to her house or before the accident.

{¶16} In addition to the above testimony, depositions of Debra Steinke (Steinke's wife), Dave King, Taylor Etzkorn, Ben Butcher, Theodore Baumer, Mike Rickert, Jason Boyer ("Boyer"), Bobbie Ott, Hannah Ott, and Declen Masur were submitted for review. None of the testimony indicated that Steinke had been to Meyer's Tavern on March 11, 2020. Boyer specifically testified that he went to Meyer's Tavern daily in the midafternoon. When asked if he would see Steinke at Meyer's Tavern, he responded "No, you'd never see him in there in the afternoons". Boyer Dep. at 9. The only evidence to indicate that Steinke might have been at Meyer's Tavern is the receipt labeled "Frank" with no last name.

{¶17} Appellant's expert, Henry A. Spiller ("Spiller") admitted in his deposition that the receipt was the only evidence he had that indicated Steinke may have been at Meyer's Tavern on March 11, 2020. Spiller based his conclusion that Steinke must have been the "Frank" listed on the receipt upon his calculations that the drinks listed would account for Steinke's BAC at the times tested. However, to arrive at this result, Spiller had to make several assumptions. He assumed that Steinke arrived around noon, drank every drink on the tab, drank at a steady pace, and then quit drinking between 3:00 pm and 3:15 pm to go to Dawn's home where he then started drinking again. Spiller testified that if all of his assumptions were correct, Steinke would have exhibited signs of intoxication when he was ordering his drinks at Meyer's Tavern. Spiller admitted that he did not know the exact

alcohol content of the mixed drinks and just used a "standard drink" for his calculations. Spiller also admitted that he did not consider the two empty beer cans found at the scene of the accident in his calculations. When questioned about how his conclusions would be affected if he was wrong in one of his assumptions, Spiller admitted that his calculations would also change. When Spiller was asked about the tab being started at 2:09, as shown on the receipt, rather than noon as Spiller had assumed, Spiller testified that if that time was correct, any symptoms of intoxications would occur at a later time than he had originally determined. In reaching his conclusions, Spiller discounted the testimony of Dawn as to Steinke not appearing intoxicated when he arrived at her home as unreliable, but found her reliable as to the amount of alcohol Steinke consumed at her home. However, Spiller admitted that he was only basing his determination of credibility upon his own expectations, as he had never spoken with Dawn. When questioned, Spiller admitted that he had no personal knowledge as to when, where, or what Steinke was drinking, just that Steinke had drank more than he admitted.

{¶18} To prevail on a claim against Appellees, Appellant must demonstrate that Steinke was at Meyer's Tavern on March 11, 2020, that an employee of Meyer's Tavern sold alcohol to Steinke, that the employee sold the alcohol despite knowing that Steinke was intoxicated, and that Nicole was injured by Steinke due to his intoxication. The element of Nicole's personal injury due to Steinke's intoxication

is not disputed. Thus, this Court need only look to see if there are any material issues of fact as to the first three elements. Appellees presented numerous depositions, including that of Steinke himself, which indicated that Steinke was not present at Meyer's Tavern on March 11, 2020. There is no first hand evidence from anyone that Steinke went to Meyer's Tavern on the day of the accident or that he was intoxicated when he arrived at Dawn's home. If Steinke did not go to Meyer's Tavern that day, Appellees could not have sold him alcohol knowing he was intoxicated.

{¶19} In rebuttal, Appellant points to the testimony of Spiller. However, Spiller's testimony is solely based upon inferences from a receipt labeled "Frank" that may or may not have belonged to Steinke. Spiller's testimony was that if everything was as he presumed, then the receipt could account for the level of intoxication that Steinke exhibited when his BAC was tested later in the evening. However, Spiller admitted that he did not know if Steinke was at Meyer's Tavern and that Steinke could have been drinking at home or drank more at Dawn's home, which would have resulted in the same BAC. Additionally, Spiller's calculations were based upon a presumption that Steinke started drinking at noon, which was speculation on his part. The speculated start time was disputed by the receipt, which showed an opening time of 2:09 pm. All of Spiller's calculations were based upon what was on the receipt, but he did not accept the start time as being accurate, though

he did accept the end time as being correct. The reason for this was that if any of the assumptions were not correct, his conclusion would be errant. The conclusion that the alcohol on the receipt, assuming it belonged to Steinke, could have accounted for the BAC does not raise a material issue of fact when the underlying assumptions are not supported by facts, but are instead based upon other assumptions.

> Circumstantial evidence is a fact proven by direct evidence that leads to the reasonable inference drawn from that evidence. * * * An inference is reasonable when it is drawn from facts in evidence, while an inference is unreasonable or speculative when it is not supported by facts in evidence.

*Woodside Management Co. v. Bruex,* 9th Dist. Summit No. 29179, 2020-Ohio-4039, ¶ 72, 157 N.E.3d 295. Drawing one inference solely from another inference without additional facts is not allowed. *Id.* To determine that there is a genuine issue of material fact as to the presence of Steinke at Meyer's Tavern would require this court to make multiple inferences stacked upon each other to reach the desired conclusion. That is not permissible. Viewing the evidence in a light most favorable to Appellant, there is a genuine issue of material fact that Steinke drank more alcohol than he admits, but it does not show where Steinke drank the alcohol. There is no evidence that Steinke was present at Meyer's Tavern on March 11, 2020. Without evidence that Steinke was at Meyer's Tavern, one cannot reasonably conclude that an employee of Meyer's Tavern sold him any alcohol on March 11,

2020, or that the employee who was selling the alcohol knew Steinke was intoxicated when selling the alcohol. Reasonable minds can only reach one conclusion as to the claims against Appellees and that conclusion is adverse to Appellant. The first and second assignments of error are overruled.

*Request for Additional Time*

**{¶20}** In the fourth assignment of error, Appellant claims that the trial court erred by failing to permit additional time to complete discovery and respond to the motion for summary judgment filed by Appellee. Similarly, Appellant argues in the third assignment of error that the trial court erred by granting the motion for summary judgment the day after ruling that Appellant was entitled to additional discovery.

**{¶21}** Appellee's motion for summary judgment was filed on May 31, 2022. Appellant filed its response to Appellee's motion for summary judgment on June 28, 2022. The response argued that there were material issues of fact and, in the alternative, argued that a continuance pursuant to Civil Rule 56 was necessary.

> The decision whether to grant a continuance pursuant to Civ.R. 56(F) rests within the sound discretion of the trial court. * * * A party seeking a Civ.R. 56(F) continuance has the burden of establishing a factual basis and reasons why the party cannot present sufficient documentary evidence without a continuance.

*Shirdon v. Houston,* 2d Dist. Montgomery No. 21529, 2006-Ohio-4521, ¶ 10.

> An abuse of discretion is not merely an error of judgment." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 20 (3d Dist.). "Rather, an

> abuse of discretion is present where the trial court's decision was arbitrary, unreasonable, or capricious." *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, 2017 WL 2628060, ¶ 23.
> "When the abuse of discretion standard applies, an appellate court is not to substitute its judgment for that of the trial court." *State v. Richey*, 2021-Ohio-1461, 170 N.E.3d 933, ¶ 40 (3d Dist.).

*State v. Edwards*, 3d Dist. Union No. 14-23-11, 2023-Ohio-3213, ¶ 6, 224 N.E.3d 614.

**{¶22}** Appellant's response to the motion for summary judgment in this case was not a minor response, but consisted of hundreds of pages. After the motion for summary judgment and Appellant's response were filed, discovery continued. The trial court granted the motion for summary judgment on June 5, 2023, more than a year after the motion was filed and over 11 months after Appellant filed a response. Doc. 150. The trial court reviewed the depositions of 19 people, two of which were taken after Appellant's response was filed. Not one person was able to place Steinke in Meyer's Tavern on March 11, 2020. The closest Appellant comes to meeting this burden is the receipt marked "Frank", which no one could definitively connect to Steinke. Spiller admitted that his determination that the receipt could account for the amount of alcohol necessary for Steinke's BAC to be the measured levels later that evening was based upon his speculation as to the time Steinke would have been drinking. Spiller also admitted that he had no evidence besides the receipt that Steinke was ever at the bar and had no evidence, beyond his own speculation, that the receipt belonged to Steinke. The only additional discovery that appeared to be

-17-

allowed was a list of employees at Meyer's Tavern in 2020. Appellant had already received a list of employees who were working on March 11, 2020, so the additional employees would not have been in a position to testify that Steinke was at Meyer's Tavern on that day. Appellant argues that the employees may have been able to testify to conversations they heard in the bar regarding Steinke after the accident. However, Appellant has presented no factual basis that would show why they would expect these employees to testify differently when all of the employees who were working on March 11, 2020, and gave depositions indicated that no one in the bar on that day had seen Steinke at Meyer's Tavern. Under the circumstances presented in this case, we do not conclude that the trial court abused its discretion in ruling on the motion when it did, thus denying the motion for a continuance. The third and fourth assignments of error are overruled.

*Motion to Compel*

{¶23} Appellants claim in the fifth assignment of error that the trial court erred in denying its motion to compel a forensic inspection of cell phones and a personnel file. The denial of a motion to compel is reviewed under an abuse of discretion standard. *Moore v. Ferguson*, 5th Dist. Richland No. 12CA58, 2012-Ohio-6087, ¶ 25.

{¶24} On July 28, 2022, Appellant filed a motion to compel a forensic inspection of the cell phones of Robert, Josh, and Koenig. Appellees filed a

response on August 11, 2022. In the response, Appellees argue that a forensic inspection of phones would be a burden because there was no basis for believing that there was any information on the phones because the parties testified there was not. Koenig testified in her deposition that she had no electronic communications with anyone regarding the accident. Appellees argued that there was no evidence to justify the invasion of privacy and that Appellant's claim of failure to provide the requested documents was based solely upon "speculation and hope that said documents exist." Doc. 132. Appellant filed a response alleging that Appellees were withholding information. On October 27, 2022, Appellant also filed a motion to compel the personnel file of Koenig. Appellees filed a memorandum in opposition and a motion for a protective order on November 10, 2022. On June 2, 2023, the trial court entered judgment denying both of Appellant's motions to compel.

{¶25} In order to justify the invasion of privacy that a forensic investigation into a person's cell phone, the requesting party must show a "background of noncompliance". *Nithiananthan v. Toirac*, 12th Dist. Warren No. CA2011-09-098, 2012-Ohio-431, ¶ 9.

> Generally, courts are reluctant to compel forensic imaging, largely due to the risk that the imaging will improperly expose privileged and confidential material contained on the hard drive. Because allowing direct access to a responding party's electronic information system raises issues of privacy and confidentiality, courts must guard against undue intrusiveness. * * *

Thus, before compelling forensic imaging, a court must weigh "the significant privacy and confidentiality concerns" inherent in imaging against the utility or necessity of the imaging. * * * In determining whether the particular circumstances justify forensic imaging, a court must consider whether the responding party has withheld requested information, whether the responding party is unable or unwilling to search for the requested information, and the extent to which the responding party has complied with discovery requests. * * * When a requesting party demonstrates either discrepancies in a response to a discovery request or the responding party's failure to produce requested information, the scales tip in favor of compelling forensic imaging.

*Bennett v. Martin*, 186 Ohio App.3d 412, 2009-Ohio-6195, ¶ 40-41, 928 N.E.2d 763 (citations omitted). The trial court reviewed the requests and noted that requesting certain items and being told the items do not exist "does not equate to a refusal by the responding party to search and/or provide said documents." Doc. 149 at 4.

**{¶26}** Here, the trial court ruled on both motions to compel. As to the phones, the trial court noted that Appellant wanted the phones of Robert, Josh and Koenig for a forensic investigation. The trial court noted that all three of these parties had been questioned about text messages, emails, and other documents and testified during their depositions that no such items existed. The trial court also noted that Josh and another witness had both testified that in the more than two years since the accident, the phones they had on March 11, 2020, had been accidentally destroyed. Although the phones were destroyed, there was "no evidence or even a hint that there was some sort of collusion between [the parties] to destroy these

phones." Doc. 149 at 5. The trial court found no evidence in any of the depositions or exhibits provided to the court to show that the parties were lying about the evidence not existing or that they were attempting to avoid complying with discovery. The findings of the trial court were supported by evidence before it.

{¶27} Next, the trial court addressed the motion to compel Koenig's personnel files including her W-2 for 2020. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Civ.R. 26(B)(1). Appellant requested the file because "her personnel file could potentially contain information about her actions on March 11, 2020, as well as information about her lack of training and knowledge with regard to the responsible service of alcohol". Doc. 141 at 7. When reviewing the request, the trial court noted that the personnel file would contain personal and private information. The trial court also noted that Appellees had already admitted that prior to the accident, Koenig had not been trained to recognize when someone was intoxicated. Since that matter was not disputed, Appellant had no need for the personnel file for that reason.

{¶28} As to the potential information regarding March 11, 2020, there was no evidence to support the claim that such information even existed. When questioned during their depositions, both Robert and Josh indicated that they had asked Koenig if Steinke was in the bar on March 11, 2020, and that she had told them no. Josh then reviewed the security footage and did not see Steinke in the bar. According to both Robert and Josh, that was the end of the matter. No evidence indicated that anything was added to Koenig's personnel file regarding March 11, 2020. Given the evidence before it, the trial court did not abuse its discretion in denying the motion to compel. The fifth assignment of error is overruled.

{¶29} Having found no error prejudicial to the Appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Allen County is affirmed.

*Judgment Affirmed*

**ZIMMERMAN and MILLER, J.J., concur.**